[No. B049202. Second Dist., Div. Seven. May 7, 1991.]

H. F. AHMANSON & COMPANY et al., Plaintiffs and Appellants, v.
SALOMON BROTHERS, INC., et al., Defendants and Respondents.

**COUNSEL**

Belin & Rawlings and Daniel N. Belin, Douglas M. Rawlings and Lisa D. Norlander for Plaintiffs and Appellants.

Wachtell, Lipton, Rosen & Katz, Douglas S. Liebhafsky, Alschuler, Grossman & Pines, Frank Kaplan and Michael Linfield for Defendants and Respondents.

**OPINION**

**JOHNSON, J.**—Plaintiffs appeal from an order denying their motion to disqualify defendants' attorneys on the ground of conflict of interest. We affirm.

### FACTS AND PROCEEDINGS BELOW

Plaintiffs H. F. Ahmanson & Company and others (hereafter Ahmanson) hired defendant Salomon Brothers, Inc., to provide financial advice and investment banking services in connection with Ahmanson's acquisition of Bowery Savings Bank. Ahmanson contends it suffered over $100 million in damages as a result of Salomon Brothers' negligent and self-serving advice in the course of the Bowery transaction. Ahmanson filed a complaint against Salomon Brothers alleging breach of fiduciary duty, fraud, negligence, negligent misrepresentation and breach of contract. Salomon Brothers filed a cross-complaint against Ahmanson for breach of contract.

Before us is the question whether the trial court erred in refusing to disqualify the lead counsel representing Salomon Brothers, the New York law firm of Wachtell, Lipton, Rosen & Katz (hereafter Wachtell).[1]

Prior to any involvement by Wachtell, the Bowery Savings Bank found itself in severe financial difficulty resulting from the fact the interest it was required to pay to attract depositors exceeded the income the bank earned on its fixed-rate loans. In order to avoid insolvency, Bowery and the Federal Deposit Insurance Corporation (FDIC) entered into an assistance agreement designed to protect Bowery from credit and interest rate risks.

Under the interest rate risk protection, Bowery paid the FDIC the fixed rate of income received from its assets and the FDIC paid Bowery a variable rate of interest on those same assets based on current market rates. Thus, Bowery's interest cost and interest income were both variables. When interest rates went up, Bowery's income from interest payments by the FDIC also went up, guaranteeing Bowery's income would stay ahead of its interest obligations to its depositors.

Under the credit risk protection, the FDIC promised, with respect to certain Bowery assets, that if the asset went into default the FDIC would purchase it from Bowery. However, if Bowery sold one of these protected assets to a third party and replaced it with another asset the FDIC credit protection was lost as to that asset and did not apply to the replacement asset.

One problem with the assistance agreement was that some of the assets protected by the agreement would not mature until after the agreement expired. Thus, after the agreement expired, Bowery once again would be exposed to the same financial problems it had before the agreement. Bowery engaged the services of the First Boston Corporation to advise it how to eliminate or minimize risks of interest rate variables and defaults once the assistance agreement expired. First Boston advised Bowery to replace assets maturing after the assistance agreement expired with assets maturing within the life of the assistance agreement. By matching the maturity of its assets to the life of the FDIC assistance agreement, Bowery would avoid the shortfall caused by variable interest rates. However, once a later maturing asset was sold Bowery lost the credit protection on that asset and the replacement asset. The FDIC could not be forced to purchase the new asset if it went into default. Thus, under the plan proposed by First Boston, Bowery would be trading credit protection for interest rate protection.

---

[1] Because we affirm the trial court's order we do not reach the question whether disqualification should extend to Salomon Brothers' local counsel and its corporate counsel on a theory of vicarious disqualification.

At this point Bowery engaged the services of Wachtell, and principally Harold S. Novikoff, a partner in the firm, to provide advice about the advice it had received from First Boston. The parties agree Wachtell, through Mr. Novikoff, provided Bowery with advice about the credit risks associated with the types of transactions proposed by First Boston. This advice included explaining the mechanics of the transactions, the degree of protection that could be obtained, drafting or revising legal documents regarding Bowery's contemplated transactions and negotiating with other participants in the transaction. The parties also agree Mr. Novikoff attended two meetings with Bowery top management, both on the same day, at which he explained the credit risks involved in a particular transaction Bowery was contemplating with First Boston. Mr. Novikoff insists his advice to Bowery at these meetings was limited to the credit risks involved in the proposed Bowery-First Boston transaction. He denied advising or receiving information on any other aspect of Bowery's business. Bowery's former chairman, Richard Ravitch, filed a declaration supporting Mr. Novikoff's version of events. Mr. Ravitch stated, "Bowery asked Wachtell . . . only for advice on how to protect against credit risks on certain kinds of transactions with other financial institutions which Bowery contemplated undertaking in the future." Ahmanson submitted declarations from other Bowery officials to the effect that while attending these meetings Mr. Novikoff either discussed or overheard discussions concerning Bowery's broader business strategies.

In 1987, Ahmanson set out to acquire the Bowery Savings Bank. Ahmanson hired Salomon Brothers to provide advice in connection with the acquisition. Salomon Brothers advised Ahmanson it should renegotiate Bowery's interest rate protection under the FDIC assistance agreement. The FDIC was unwilling to agree to modification in the interest rate protection without concessions from Ahmanson. Based on Salomon Brothers' advice, Ahmanson agreed to relinquish credit risk protection on over $1 billion of Bowery assets and to a six-year reduction in the term of interest rate risk protection. Then, just before the Bowery acquisition was to close, Salomon Brothers advised Ahmanson the new interest rate protection it had negotiated with the FDIC actually had a negative $25 million value to Bowery and Ahmanson should cancel the interest rate protection altogether and replace it with a series of interest rate swaps which Salomon Brothers would arrange. Upon Salomon Brothers' advice, Ahmanson cancelled the FDIC interest rate protection agreement. Notwithstanding cancellation of the interest rate protection, Ahmanson was still bound by the earlier concessions to the FDIC including the loss of credit protection on a large amount of Bowery's assets.

A few days after the acquisition of Bowery closed, Salomon Brothers advised Ahmanson it had made a mistake in evaluating the FDIC interest

rate protection. Instead of a $25 million negative value, the interest rate protection actually had a $30 million *positive* value. Anticipating the litigation that was to follow, Salomon Brothers retained Wachtell to represent it. In the course of discovery proceedings in this litigation, Ahmanson learned that Wachtell had once advised Bowery Savings Bank with respect to credit risk protection. Ahmanson then moved to disqualify Wachtell on the ground of conflict of interest.

## DISCUSSION

### I. SUCCESSIVE REPRESENTATION AS GROUNDS FOR DISQUALIFICATION

■ It is beyond dispute a court may disqualify an attorney from representing a client with interests adverse to those of a former client. (*Wutchumna Water Co.* v. *Bailey* (1932) 216 Cal. 564, 573-574 [15 P.2d 505]; *Gregori* v. *Bank of America* (1989) 207 Cal.App.3d 291, 298 [254 Cal.Rptr. 853].) Disqualification in cases of successive representation is based on the prohibition against "employment adverse to a . . . former client where, by reason of the representation of the . . . former client, the [attorney] has obtained confidential information material to the employment. . . ." (Rule 3-310, Rules Prof. Conduct [23 West's Ann. Civ. & Crim. Court Rules, pt. 2 (1990 Supp.) p. 445; Deering's Ann. Rules of Court (1991 pocket pt.) p. 19].) Where such a conflict of interest exists, and the former client has not consented to the current representation, disqualification follows as a matter of course. The court does not engage in a "balancing of equities" between the former and current clients. The rights and interests of the former client will prevail. (*River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1304, 1308 [234 Cal.Rptr. 33].)

### II. STANDARD OF APPELLATE REVIEW

■ In our review of disqualification motions, as elsewhere, the judgment of the lower court is presumed correct and all intendments and presumptions are indulged to support it on matters as to which the record is silent. (*Centinela Hospital Assn.* v. *City of Inglewood* (1990) 225 Cal.App.3d 1586, 1595 [275 Cal.Rptr. 901].) Conflicts in the declarations are resolved in favor of the prevailing party and the trial court's resolution of factual issues arising from competing declarations is conclusive on the reviewing court. (*Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at p. 300; *Chadwick* v. *Superior Court* (1980) 106 Cal.App.3d 108, 115 [164 Cal.Rptr. 864].)

### III. Ahmanson Failed to Establish Wachtell Possesses Adverse Confidential Information From Bowery

█  A former client may seek to disqualify a former attorney from representing an adverse party by showing the former attorney actually possesses confidential information adverse to the former client. However, it is well settled actual possession of confidential information need not be proved in order to disqualify the former attorney. It is enough to show a "substantial relationship" between the former and current representation. (*Global Van Lines, Inc.* v. *Superior Court* (1983) 144 Cal.App.3d 483, 489 [192 Cal.Rptr. 609].) If the former client can establish the existence of a substantial relationship between representations, the courts will conclusively presume the attorney possesses confidential information adverse to the former client.[2] (*River West, Inc.* v. *Nickel, supra*, 188 Cal.App.3d at p. 1303; and see *Developments in the Law: Conflicts of Interest in the Legal Profession* (1981) 94 Harv. L. Rev. 1244, 1315-1334 (hereafter *Conflicts of Interest*).)

The prophylactic approach of *T. C. & Theatre Corp.* does not require the former client to *prove* the former attorney possesses confidences which could be used to the former client's disadvantage. Instead, it proscribes the subsequent representation solely on the ground that subsequent representation, because of its substantial relationship to the former, places the attorney in a situation where he or she could breach the duty of confidentiality to the former client. (*River West, Inc.,* v. *Nickel, supra*, 188 Cal.App.3d at p. 1303; *Conflicts of Interest, supra*, 94 Harv. L. Rev. at p. 1318.) This approach was endorsed by our Supreme Court in *People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 156-157 [172 Cal.Rptr. 478, 624 P.2d 1206] in which the court enjoined the Attorney General from suing state officials on a matter in which he had previously furnished them legal advice. Although the court did not mention the substantial relationship theory by name, the court did note "the record here does not reveal whether the Attorney General acquired any knowledge or information from his clients . . . [but] [¶] whether he 'did in fact receive confidential information is irrelevant, the

---

[2] The "substantial relationship" test was first announced in *T. C. & Theatre Corp.* v. *Warner Bros. Pictures* (S.D.N.Y. 1953) 113 F.Supp. 265, 268, in which the court stated:

"[T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are *substantially related* to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent." (Italics added.)

The test has been adopted by most federal courts and by California appellate courts. (See, e.g., *Global Van Lines, Inc.* v. *Superior Court, supra*, 144 Cal.App.3d at p. 488, fn. 3, 489; *Johnson* v. *Superior Court* (1984) 159 Cal.App.3d 573, 578 [205 Cal.Rptr. 605]; *River West, Inc.* v. *Nickel, supra*, 188 Cal.App.3d at pp. 1302-1303; *Kirk Corp.* v. *First American Title Co.* (1990) 220 Cal.App.3d 785, 812-813 [270 Cal.Rptr. 24].)

policy considerations of the Code precluding that inquiry. . . .' " (*Id.* at p. 156, quoting from *State of Ark.* v. *Dean Food Products Co., Inc.* (8th Cir. 1979) 605 F.2d 380, 384.)

The conclusive presumption of knowledge of confidential information has been justified as a rule of necessity, "for it is not within the power of the former client to prove what is in the mind of the attorney. Nor should the attorney have to 'engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation.' " (*Global Van Lines, Inc.* v. *Superior Court, supra,* 144 Cal.App.3d at p. 489, quoting from *Conflicts of Interest, supra,* 94 Harv. L. Rev. at p. 1318.) The conclusive presumption also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest. (*Conflicts of Interest, supra,* 94 Harv. L. Rev. at p. 1319.)

While most courts and commentators agree with the prophylactic approach to disqualification established by *T. C. & Theatre Corp.*,[3] they also recognize the drawbacks to this approach. It is overinclusive. It may impose a significant hardship on the current client. It may unfairly limit the employment opportunities of lawyers. And, finally, it may stifle development of expertise in complex areas of law. (See *Gregori* v. *Bank of America, supra,* 207 Cal.App.3d at p. 300; *Conflicts of Interest, supra,* 94 Harv. L. Rev. at pp. 1319-1320; *Law of Disqualification, supra,* 73 Nw.U.L.Rev. at p. 1004.)

Another problem inherent in the "substantial relationship" approach is just what meaning to give those two words. The word "substantial," like other nonquantifiable denominators of measurement, is subject to a variety of interpretations. Use of the word "relationship" implies a connection, but offers no guidance as to *what* is being connected: subject matters, facts, or issues. (See *T. C. & Theatre Corp.* v. *Warner Bros. Pictures, supra,* 113 F.Supp. at p. 268 [subject matter]; *Trone* v. *Smith* (9th Cir. 1980) 621 F.2d 994, 998 [facts]; *Government of India* v. *Cook Indus.* (2d Cir. 1978) 569 F.2d 737, 739-740 [issues]; and see *Global Van Lines, Inc.* v. *Superior Court, supra,* 144 Cal.App.3d at pp. 486-489 [finding a substantial relationship between subject matter, issues and facts].)

---

[3] See, e.g., *Conflicts of Interest, supra,* 94 Harv. L. Rev. at pages 1318-1319; Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy* (1979) 73 Nw.U.L. Rev. 996, 1001-1003 (hereafter *Law of Disqualification*); Comment, *Federal Courts and Attorney Disqualification Motions: A Realistic Approach to Conflicts of Interest* (1987) 62 Wash. L. Rev. 863, 863-864 (hereafter *Attorney Disqualification*).

Finally, it must be recognized disqualification motions based on an alleged substantial relationship between representations are commonly used for purely strategic purposes to delay the litigation, harass the opposing party or pressure for a more favorable settlement. (*Gregori* v. *Bank of America, supra*, 207 Cal.App.3d at p. 301; *Attorney Disqualification, supra*, 62 Wash. L. Rev. at p. 877.)

In recognition of the important interests of the current client and its attorney and the potential for abuse, the substantial relationship test has undergone modifications and refinements since it was first announced in *T. C. & Theatre Corp.* in 1953. These changes have focused primarily on the requirements that trigger the conclusive presumption the attorney possesses confidences which could prejudice the former client in the present matter. Thus, the rule followed in California is that the attorney's possession of confidential information will be presumed only when " 'a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney . . . .' " (*Johnson* v. *Superior Court, supra*, 159 Cal.App.3d at p. 578, quoting *Global Van Lines, Inc.* v. *Superior Court, supra*, 144 Cal.App.3d at p. 489 and see *People* ex rel. *Deukmejian* v. *Brown, supra*, 29 Cal.3d at pp. 155-156.)

Under the *Global Van Lines* formulation of the test, the courts focus less on the meaning of the words "substantial" and "relationship" and look instead at the practical consequences of the attorney's representation of the former client. The courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation. (144 Cal.App.3d at p. 489.)

Thus, in *Global Van Lines*, the court ordered disqualification of plaintiff's attorney, the former general counsel for defendant Global Van Lines, in a suit over an agency contract between plaintiff and Global. The court noted that in his role as general counsel for Global Van Lines, plaintiff's attorney was directly or indirectly involved in the agency agreement at issue in the litigation. (144 Cal.App.3d at p. 490.) In *Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752 [261 Cal.Rptr. 100], the court upheld the disqualification of plaintiff's attorney, who had previously represented both parties in a dispute with a third party. The court found that by virtue of that representation, the attorney had necessarily acquired confidential information relevant to issues in the current dispute. (*Id.* at pp. 760-761.)

In *Dill* v. *Superior Court* (1984) 158 Cal.App.3d 301 [205 Cal.Rptr. 671], the court ordered the disqualification of the law firm representing defendants where an attorney, prior to becoming a member of the firm, had represented the plaintiff in this very same lawsuit. The court concluded that in the course of the attorney's representation of Dill, during which he appeared at a hearing and conducted depositions "confidential information pertinent to the case ordinarily would have been imparted." (*Id.* at p. 305.)

On the other hand, the fact a member of the law firm representing the defendant had once assisted the plaintiffs in preparing a declaration of covenants, conditions and restrictions (CC&R's) for the same condominium project involved in the current litigation was held not to be grounds for disqualification. (*Kirk Corp.* v. *First American Title Co., supra*, 220 Cal.App.3d at pp. 804, 813.) The court found no evidence to suggest that by virtue of its advice on the CC&R's defendant's law firm obtained confidential information material to the present litigation. (*Id.* at p. 813.).)

The pragmatic approach, which focuses on the nature of the former representation, is well established in the federal courts. (See, e.g., *Trone* v. *Smith, supra*, 621 F.2d 994, 1001; *Government of India* v. *Cook Indust., Inc., supra*, 569 F.2d 737, 739.) The rationale for this approach was explained in *Silver Chrysler Plymouth, Inc.* v. *Chrysler Mot. Corp.* (2d Cir. 1975) 518 F.2d 751, 757 in which the court stated the substantial relationship test is "intended to protect the confidences of former clients when an attorney has been in a position to learn them." Therefore, to apply the remedy of disqualification "when there is no realistic chance that confidences were disclosed would go far beyond the purpose" of the substantial relationship test.

In his concurring opinion in *Silver Chrysler, supra*, Judge Adams suggested an analysis of "substantial relationship" claims which we find logical and compatible with the purpose of the substantial relationship test and, therefore, adopt for purposes of the case before us. Judge Adams suggested the court should "focus on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases. As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy." (518 F.2d at p. 760 (Adams, J., conc.).)

With these principles in mind, we examine the nature of the representation Wachtell provided Bowery Savings Bank and the nature of the current controversy.

## A. Factual Similarities Between Wachtell's Advice to Bowery and Its Representation of Salomon Brothers.

Wachtell submitted declarations establishing its engagement, and Mr. Novikoff's advice, were strictly limited to credit protection strategies. In particular, Mr. Novikoff advised Bowery about the credit risks involved in repurchase agreements known in the banking business as "repos."[4] Mr. Novikoff's declaration states the issue of credit risk, on which he advised Bowery, is different from, and unrelated to, interest rate risk and does not relate to a bank's strategy for maximizing its overall returns except in the sense no bank wants to be defrauded or do business with a bankrupt. Mr. Novikoff's advice to Bowery on the credit risks of repo agreements was mostly generic. That is, it was general in nature and was the same advice he had given to numerous other financial institutions. The only specific transaction on which Mr. Novikoff advised Bowery was a proposed repo agreement between Bowery and First Boston Corporation.

In contrast to the factual situation in which Mr. Novikoff advised Bowery, described above, the facts of the present litigation have to do with Salomon Brothers' erroneous advice to Ahmanson to cancel Bowery's interest rate protection agreement with the FDIC. It is clear from the record Mr. Novikoff did not advise Bowery or Ahmanson on the subject of cancelling the interest rate protection. In fact, he did not provide any advice on the subject of interest rate protection. Nothing in the record suggests Mr. Novikoff counseled Salomon Brothers regarding its advice to Ahmanson to cancel the interest rate protection. Furthermore, there is no showing Mr. Novikoff or the Wachtell law firm counseled Salomon Brothers as to any aspect of the advice it gave Ahmanson in the Bowery acquisition.

The only possible connection between Salomon Brothers' advice to Ahmanson and Mr. Novikoff's advice to Bowery is that the advice fell within the general subject of credit risk protection. Mr. Novikoff advised Bowery that if it wished to undertake repo transactions it should insist on certain terms and conditions to protect itself from fraud or insolvency on the part of the other institution involved in the transaction. Salomon Brothers advised Ahmanson to relinquish the credit risk protection as to certain Bowery assets under the FDIC assistance agreement. The FDIC risk protection, it will be recalled, provided that in the event one of Bowery's protected assets went into default the FDIC was required, at Bowery's election, to purchase that asset. This was not a form of credit risk protection about which Novikoff counseled Bowery. The FDIC agreement was in effect long

---

[4] According to Mr. Novikoff, "[a] repo is simply an agreement by one party to buy a security from a counter-party at a fixed price and to sell that security back to the counter-party at a fixed price either on demand or at a fixed time."

before Mr. Novikoff was retained and remained in effect after he wound up his representation of Bowery. The trial court impliedly found, and we agree, there are no factual similarities between the advice Mr. Novikoff gave Bowery and the advice Salomon Brothers gave Ahmanson bearing on the present litigation.

### B. *Similarities Between the Legal Questions Posed.*

Here again the record discloses no similarities between the legal questions posed in protecting Bowery from credit risks in repo transactions and the legal questions posed by Salomon Brothers' advice to Ahmanson to renegotiate and, ultimately, to cancel the interest rate protection agreement between Bowery and the FDIC.

The legal questions posed by the repo transactions related to how Bowery could structure those transactions to protect itself against fraud or insolvency on the part of the other institutions involved in the transactions.

The legal questions involved in the present litigation relate to whether Salomon Brothers acted fraudulently, negligently or in breach of its fiduciary duty to Ahmanson in advising Ahmanson to cancel its interest rate protection with the FDIC and replace it with a series of interest rate swaps which Salomon Brothers would arrange. Assuming Salomon Brothers is liable to Ahmanson, legal questions related to the calculation of damages may also arise.

The trial court correctly concluded there was no similarity in the legal issues posed by the Bowery and Salomon Brothers' transactions.

### C. *The Nature and Extent of the Attorney's Involvement With the Cases.*

In *Silver Chrysler, supra,* Judge Adams suggested the court examine the time spent by the attorney on the earlier case, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy. (518 F.2d at p. 760 (Adams, J., conc.).) This suggestion is consistent with the view expressed by the majority opinion in *Silver Chrysler* that "there is reason to differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions." (*Id.* at p. 756.) The evidence established the representation Mr. Novikoff provided to Bowery was clearly on the periphery of Bowery's business dealings under the FDIC assistance agreement.

In his declaration, Mr. Novikoff described the nature of his legal work for Bowery as follows: "As an attorney advising clients on these matters, my work typically consists of (a) explaining the credit risks of the different types of repos, securities loans and dollar rolls; (b) explaining the mechanics of the transactions; (c) explaining the degree of protection against credit risk that can be obtained through delivery repos and third-party repos (and similar means of curtailing credit risk in securities loans and dollar rolls); (d) drafting or revising the forms of legal documents required to govern the relationships of participants in delivery repo and third-party repo transactions, including custodial agreements; and (e) occasionally negotiating with other participants in such transactions, such as counter-parties and clearing banks, to secure agreement to the mechanics of the chosen method of reducing credit risk." Mr. Novikoff declared the typical advice described above was the advice he gave to Bowery. In addition, he advised Bowery on a specific repo transaction it was contemplating with First Boston Corporation.

Mr. Novikoff's declaration goes on to state, "In advising Bowery on credit risks and performing related work, neither I nor anyone else at [Wachtell] needed to know, asked to know, or was told anything about the Bowery's overall strategy for maximizing its returns or the interest-rate risks to which it was exposed; nor did I know or need to ask anything concerning the source of the funds and securities invested by the Bowery in repo transactions. . . . [ ] I never received any information from the Bowery concerning its strategy for maximizing its overall returns, or concerning its exposure to interest-rate risk or its efforts to limit or change such exposure; I never asked for any such information; and such information would have been irrelevant to the work I was retained to perform and did perform. I never received information, or rendered advice, concerning such matters as the Bowery's relationship with the Federal Deposit Insurance Corporation (the 'FDIC'), or whether the Bowery was making efforts to limit interest-rate risk through such transactions as interest-rate swaps, interest-rate caps or interest-rate collars. No one at [Wachtell] was asked to, or did, communicate with or advise Bowery regarding interest-rate swaps or any similar transactions available in the financial markets to provide protection against interest-rate risk."

It is reasonable to conclude from Mr. Novikoff's declaration that in the normal course of the representation he provided he would not be privy to any client confidences regarding overall business strategy. Novikoff entered into a brief relationship with Bowery Savings Bank related solely to legal questions on the credit risk of repo transactions, a matter clearly on the periphery of Bowery's overall business policies and strategies.

From the foregoing analysis, we conclude Ahmanson failed to establish a substantial relationship between Wachtell's representation of Bowery on the question of credit risk protection in repo transactions and Wachtell's representation of Salomon Brothers on the question of its liability to Ahmanson for its advice to renegotiate and ultimately cancel Bowery's interest rate risk protection with the FDIC.

   D.  *Ahmanson Has Failed to Establish Any Relevant Confidences Were in Fact Revealed to Wachtell in the Course of Its Advice to Bowery.*

■   Even if Ahmanson cannot disqualify Wachtell on the basis of a *presumption* Wachtell possesses confidential information which it could use adversely to Ahmanson, disqualification would be required if Ahmanson can prove Wachtell *in fact* possesses such confidential information. Ahmanson attempts to make such a showing through declarations establishing Mr. Novikoff learned highly confidential information by virtue of his attendance at meetings where Bowery's business plans were discussed and analyzed.

We find these declarations fall far short of establishing a conflict of interest.

The declaration of John Griffiths, Bowery's executive vice-president for investments, states only that Mr. Novikoff was present and participated in discussions related to Bowery's proposed repo transaction with First Boston Corporation, a transaction we have previously determined raises no conflict of interest.

The declaration of Anthony M. Galleno, who describes himself as an "officer" of Bowery Savings Bank, contains a copy of an attachment to the minutes of Bowery's investment committee meeting at which Mr. Novikoff was present. According to Galleno, this document demonstrates one of the primary purposes of the First Boston repo transactions was to maximize Bowery's overall return on assets subject to the FDIC assistance agreement while minimizing interest rate risks by matching the durations of the protected assets to the life of the FDIC assistance agreement. The Galleno declaration does not state the attached document was ever shown to Mr. Novikoff. Even if it were, we fail to see how it reveals any client confidence relevant to the present litigation. The fact Bowery sought to maximize its earnings while minimizing its risk surely cannot be viewed as a client confidence.

Finally, Ahmanson refers us to the declaration of Martha Picone who acted as secretary to the Bowery Savings Bank and was present at the two

meetings Mr. Novikoff attended. Ms. Picone states she does not remember the legal questions asked by Bowery officers but she does remember "the questions were of many kinds and that all the legal questions were directed to Mr. Novikoff, who responded and provided all the legal advice Bowery received at those meetings." The minutes of the meetings attached to Ms. Picone's declaration show the purpose of both meetings was to approve the repo transaction between Bowery and First Boston. The minutes of the meetings also show three representatives of First Boston were in attendance at the invitation of the Bowery board of directors. Ahmanson does not contend, however, a conflict of interest arises from the legal advice Mr. Novikoff may have given the board but that one arises from the information the board gave Mr. Novikoff. The presence of representatives of First Boston at those meetings at the invitation of Bowery negates the claim that information Bowery gave Mr. Novikoff at those meetings was privileged. (See Evid. Code § 952; *Ver Bryck* v. *Luby* (1945) 67 Cal.App.2d 842, 844 [155 P.2d 706].)

## DISPOSITION

The order denying the motion to disqualify counsel is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.