**SAN GABRIEL BASIN WATER QUALITY AUTHORITY,**
Plaintiff,

v.

**AEROJET–GENERAL CORPORATION,**
Defendant.

**No. CV00–3579ABC(RCx).**

United States District Court,
C.D. California.

June 28, 2000.

Tatro, Coffino, Zeavin, Bloomgarden, Rene Tatro, Craig Bloomgarden, Juliet A. Markowitz, Los Angeles, CA, for plaintiff.

Munger, Tolles & Olson, Peter Tart, Mark Epstein, Linda Goldman, Los Angeles, CA, for defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

COLLINS, District Judge.

Defendant's Motion to Disqualify Plaintiff's Counsel came on regularly for hearing before this Court on June 26, 2000. Defendant asserts that Plaintiff's counsel, Tatro Coffino Zeavin Bloomgarden LLP ("TCZB"), should be disqualified because (1) a TCZB associate, Arthur Friedman, obtained "privileged" information from Defendant, and (2) the three TCZB attorneys in this case, René Tatro, Craig Bloomgarden, and Juliet Markowitz, previously worked for another firm that represented Defendant. After considering the materials submitted by the parties, argument of counsel, and the case file, the Court DENIES Defendant's motion.

### I. FACTUAL BACKGROUND

**A. Arthur Friedman.**

From at least 1994 through May 1998, Friedman was employed by the firm of Hancock, Rothert & Bunshoft. In 1992, Defendant filed an action entitled *Aerojet–General Corp. v. Fidelity & Casualty Co. of New York, et al.* in Sacramento Superior Court. (Blumenstein Decl. ¶ 2.) This action sought to enforce Defendant's rights to insurance coverage for groundwater contamination detected in the San Gabriel Valley near Defendant's facility in Azusa, California. (*Id.*) The Hancock firm represented one of the insurance companies, Lloyd's of London, that was adverse to Defendant. (Friedman Decl. ¶ 2.) Friedman was one of the attorneys at Hancock that worked on the matter. (Blumenstein Decl. ¶ 3.)

While Friedman represented Lloyd's, he received various documents as part of discovery. As part of Defendant's discovery responses, it produced certain documents that it claimed were privileged and confidential. (Blumenstein Decl. ¶ 8; Friedman Decl. ¶ 8.) Defendant produced these documents after the parties entered a stipulation providing that "to the extent Aerojet produces privileged documents in this lawsuit, the production of any such document(s) is made in accordance with Civil Code section 2860(d) and shall not constitute a waiver of any privilege as to any other party." (Blumenstein Decl.Ex. D.) Defendant, nevertheless, continued to withhold numerous documents from production to the Hancock firm on the ground that the documents were privileged. (Friedman Decl. ¶ 8.)

At some point in the litigation, some insurance company defendants, including Lloyd's, agreed to reimburse Defendant for part of the defense costs in the underlying environmental matters. These insurance companies, however, continued to litigate over the amount of the defense costs and over the issue of indemnity. (Friedman Decl. ¶ 3.) Apparently, after this agreement, Defendant's counsel presented annual briefings at which it kept counsel for its insurers advised of the status of the underlying proceedings. (Blumenstein Decl. ¶ 7.) Friedman attended two of these annual meetings on March 21, 1996 and April 29, 1997. (*Id.*) At this meeting, Defendant's counsel provided the carriers with "attorney-client information to which they were entitled because they were providing [Defendant with] a defense." (Taft Decl. ¶ 3.)

Friedman left the Hancock firm in March 1998 and joined TCZB's San Francisco office. (Friedman Decl. ¶¶ 11 & 12.) Friedman did not take with him any of the documents produced in the Sacramento action. (*Id.* at ¶ 11.) He has not worked on any matter for Plaintiff while at TCZB. (*Id.* at ¶ 13.) Nevertheless, on March 24, Defendant's counsel sent a letter to TCZB disclosing Defendant's belief that Friedman's work at Hancock presented a conflict of interests requiring TCZB's disqualification. (Taft Decl.Ex. A; Tatro Decl. ¶ 15.)

On the day that TCZB learned of the potential conflict of interests, the firm screened Friedman from all of Plaintiff's matters, including this litigation. On that day, Markowitz informed Friedman that he was not to discuss with anyone in the firm any information received from Defendant. (Friedman Decl. ¶ 15.)

Friedman has not reviewed any of the files associated with this litigation.[1] He has not discussed this litigation with any other TCZB member or employee. He also has not disclosed any information that he learned in the Sacramento litigation with anyone at TCZB. (Friedman Decl. ¶¶ 16–19.)

Upon learning of the potential conflict of interests, TCZB labeled all of Plaintiff's files, and the drawers in which they were kept, with the following phrase in capital and bold letters: "Confidential. Do Not Disclose to Art Friedman." (Markowitz Decl. ¶ 11.) Markowitz also spoke to every member of the firm, including staff and new hires, and followed up with an e-mail that precluded anyone from communicating with Friedman about the present litigation or Friedman's activities concerning the Sacramento action. (Markowitz Decl. ¶¶ 11 & 12.)

**B. Tatro, Bloomgarden, and Markowitz and the Heller Firm.**

All of Plaintiff's filings in this matter have listed three attorneys from the TCZB firm: Tatro, Bloomgarden, and Markowitz.

In 1977, Tatro started as an associate in Heller, Ehrman, White & McAuliffe's litigation department. He became a partner in the Heller firm in 1984. (Tatro Decl. ¶ 2.) He left the Heller firm to start TCZB in January 1995. (*Id.* at ¶ 5.) Although he worked out of Heller's San Francisco office, he started TCZB in Los Angeles. (*Id.*)

Bloomgarden joined Heller's Los Angeles office in 1990 as special counsel and he later became a partner. He left the Heller firm in May 1995 to join TCZB. (Bloomgarden Decl. ¶ 2.) Markowitz began as an associate in Heller's Los Angeles office in 1992. While still an associate, she also left the Heller firm in May 1995 to join TCZB. (Markowitz Decl. ¶ 2.)

Lawrence Hobel joined the Heller firm as a partner in 1989. Hobel had previously represented Defendant and brought Defendant to the Heller firm as a client. (Hobel Decl. ¶ 2.) During his time at the Heller firm, Hobel gave Defendant advice concerning groundwater contamination at a site in Sacramento. (Hobel Decl. ¶ 3.)

The Sacramento site was subject to a partial consent decree entered by the district court of the Eastern District of California. The partial consent decree "requires [Defendant] to operate groundwater extraction and treatment facilities, and directs [Defendant] to monitor public and private drinking water supply wells." (Hobel Decl. ¶ 5.)

The consent decree is part of Defendant's effort to remediate the contamination stemming from the Sacramento site. However, Defendant did not provide this Court with a copy of the consent decree. Defendant used both the Sacramento site and the Azusa site, which is the basis of this litigation, to develop, test, and manufacture fuel rockets. (Vanderkar Decl. ¶¶ 4 & 5.) Defendant conducted these activities in the Azusa plant in the 1940s and 1950s. (*Id.* at ¶ 4.) Defendant used the Sacramento site for these activities from

---

**1.** All such files are maintained in the Los Angeles office.

the early 1950s to at least 1989. (*Id.* at ¶ 5.) These rockets used substantial quantities of perchlorate ion. (*Id.* at ¶¶ 4 & 5.) Defendant also used volatile organic compounds ("VOC") as solvents while conducting the rocket activities. (*Id.*)

Hobel provided legal advice to Defendant "in connection with its investigation and remediation obligations as to the ... Sacramento Site under the Partial Consent Decree and under potentially applicable law." (Hobel Decl. ¶ 6.) Hobel and Defendant discussed the source of the environmental contaminants, the effect of the environmental contaminants, and remediation efforts. (*Id.* at ¶ 6.)

Hobel had similar discussions with Defendant on two other matters involving the Sacramento site. One was a class action lawsuit brought by Defendant's Sacramento neighbors. The other alleged that the Sacramento contamination had damaged a water purveyor. (Hobel Decl. ¶ 7.) Defendant also consulted Hobel about an insurance coverage claim and received advice about the handling of chemicals at the Sacramento site. (Hobel Decl. ¶ 8.)

Tatro, Bloomgarden, and Markowitz never personally worked on any of Defendant's matters while at the Heller firm. (Tatro Decl. ¶ 4; Bloomgarden Decl. ¶ 4; Markowitz Decl. ¶ 4.)

### C. The Present Lawsuit.

Plaintiff filed the present lawsuit on April 4, 2000. The complaint alleges that perchlorate and "NDMA" were discovered in the San Gabriel Valley's groundwater. (Compl. ¶ 9.) Defendant allegedly released these contaminants in conducting its rocket operations at the Azusa facility. (*Id.* at ¶ 10.)

Plaintiff joined with other governmental entities to design, construct, operate and fund the La Puente Project. This Project treats the contaminated water so that the San Gabriel Valley residents can drink the groundwater. (*Id.* at ¶ 12.)

Plaintiff seeks to recover the costs of the Project pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Plaintiff also asks for a declaration that Defendant is strictly liable for all the Project costs incurred by Plaintiff.

Defendant has answered denying liability and asserting thirty-four affirmative defenses. Various of these affirmative defenses are based on the conduct of Plaintiff. Five defenses allege that Plaintiff has failed to comply with the law. (Answer ¶¶ 13–16, 31.) Defendant also argues that (1) Plaintiff lacks standing to sue, (*Id.* at ¶ 18); (2) Plaintiff's conduct estops it from seeking relief, (*Id.* at ¶ 20); (3) Plaintiff's conduct acts as a waiver of its claims, (*Id.* at ¶ 21); (4) Plaintiff failed to mitigate damages, (*Id.* at ¶ 30); (5) Plaintiff was contributorily negligent, (*Id.* at ¶¶ 32 & 34); and (6) Plaintiff cannot recover for costs not yet incurred, (*Id.* at ¶ 39). One of the defenses asserts that the Project is not the type of expenditure that is recoverable. (*Id.* at ¶ 19.)

Another set of defenses blames the Azusa contamination on the actions of other actors. (Answer ¶¶ 22–26, 34, 36.) A third set of defenses focuses on the timing of Defendant's conduct at the Azusa facility. (*Id.* at ¶¶ 29, 40–43, 45.) A fourth set of defenses relies on facts specific to the Azusa facility or actions taken in Azusa. (*Id.* at ¶¶ 17, 33, 35.)

Defendant also asserts that its role as a government contractor precludes liability. (Answer ¶ 44.) Finally, Defendant contends that it acted with due care and that it owed no duty to Plaintiff. (*Id.* at ¶¶ 27 & 28.) [2]

---

**2.** Defendant asserts two general defenses (equity and failure to state a claim). The Court finds that these defenses are irrelevant in evaluating substantial similarity in this case.

The Court also finds that Defendant's affirmative defense to Plaintiff's attorney fee request is irrelevant.

## II. Analysis

■ The Court has the primary responsibility for overseeing the conduct of the attorneys who appear before it. *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980). Moreover, the Central District of California has adopted the "State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto" as the standard of professional conduct in the district. Local Rules, Ch. VI, R. 1.2.

Defendant asserts that the Court should disqualify TCZB because it has violated Rule 3–310(E) of the California Rules of Professional Conduct. Rule 3–310(E) states: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

### A. The Friedman Matter.

Defendant argues that the Court should disqualify TCZB because Friedman received privileged information under Cal.Civil Code 2860(d). Defendant appears to believe that because Friedman, as opposing counsel, received allegedly privileged material, that it became a client, or quasi-client, of Friedman. The Court disagrees.

### 1. *Section 2860 does not convert carrier's counsel into insured's counsel.*

■ Section 2860 requires an insurance carrier to provide independent counsel to the insured when a conflict of interests exists between the insured and the carrier. This independent counsel is often called *Cumis* counsel because § 2860 codified the substantive elements of *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.*, 162 Cal.App.3d 358, 208 Cal. Rptr. 494 (1984). *See First Pacific Networks, Inc. v. Atlantic Mutual Ins. Co.*, 163 F.R.D. 574, 576 n. 1 (N.D.Cal.1995).

Section 2860, however, also protects the interest of the carrier. Thus, the statute provides that

> it shall be the duty of [*Cumis*] counsel and the insured to disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes, and timely to inform and consult with the insurer on all matters related to the action.... Any information disclosed by the insured or by independent counsel is not a waiver of the privilege as to any other party.

Cal.Civil Code § 2860(d). However, "[t]hese obligations are strictly of an informational character, and arise only because of the unique three-cornered arrangement that carriers create when they agree to defend only under a reservations of rights." *First Pacific*, 163 F.R.D. at 579 (citing *Assurance Co. of America v. Haven*, 32 Cal.App.4th 78, 89, 38 Cal.Rptr.2d 25 (1995)). Section 2860 does not create an attorney-client relationship between *Cumis* counsel and the carrier. *Id.; Assurance*, 32 Cal.App.4th at 90, 38 Cal. Rptr.2d 25.

■ Indeed, the tension created by the potential conflict of interests between insured and carrier is "fundamentally inconsistent with a basic requirement of all attorney-client relationships: the requirement that the client have a reasonably based expectation that the communications will not be used against the client." *First Pacific*, 163 F.R.D. at 579. Moreover, "under the statute, and the cases construing it, the insured and its independent counsel retain fully the right to communicate between themselves in private— and to shield those communications from the carrier." *Id.* at 580.

■ Accordingly, § 2860 did not convert Friedman, counsel for Defendant's adversary in a previous case, into counsel for Defendant. Defendant's effort to convert Friedman into some sort of fiduciary of Defendant also fails. Even if the Court were to find that the Defendant and its carrier were in a fiduciary relationship,

once Defendant sued its carrier, any such fiduciary relationship would have ended. *See First Pacific,* 163 F.R.D. at 579 ("At least after [the carrier] reserved its rights, [the insured] was not in a confidential relationship with its carrier"); *Assurance,* 32 Cal.App.4th at 91–92, 38 Cal.Rptr.2d 25 (finding that carrier could not sue *Cumis* counsel for malpractice in part because insured and carrier are adverse in *Cumis* situation).

Because Defendant was never a client of Friedman, or any firm in which Friedman worked, Rule 3–310(E) is inapplicable.

### 2. *Friedman's statutory and contractual duty does not support disqualification of TCZB.*

 As Plaintiff concedes, however, Friedman does have a statutory and contractual duty not to disclose any privileged information he might have received from Defendant. That duty, however, does not require this Court to disqualify TCZB from representing Plaintiff.

In the first place, it is far from clear that Friedman's exposure to privileged information would require that he personally be disqualified from litigating against Defendant. *See Cooke v. Superior Court,* 83 Cal.App.3d 582, 147 Cal.Rptr. 915 (1978). In *Cooke,* a servant of Mr. Cooke surreptitiously sent privileged documents to the former Ms. Cooke. *Id.* at 586, 147 Cal. Rptr. 915. At the time, the Cookes were embroiled in a dissolution proceeding. Mr. Cooke sought to disqualify Ms. Cooke's counsel because counsel had been exposed to the privileged information. *Id.* at 589–90, 147 Cal.Rptr. 915. The trial court refused to do so and the appellate court affirmed:

> The issue before us is simply whether exposure of an attorney to confidential and privileged information requires, as a matter of law, the disqualification of that attorney and his associates. We have found no cases, and are cited to none, that establish so broad a rule.

*Id.* at 590, 147 Cal.Rptr. 915. Disqualification of an attorney, the court found, re-

quired the existence of a prior attorney-client relationship. *Id.* at 591, 147 Cal. Rptr. 915; *accord Maruman Integrated Circuits, Inc. v. Consortium Co.,* 166 Cal. App.3d 443, 447, 212 Cal.Rptr. 497 (1985). The trial court was simply required to protect Mr. Cooke "from any improper use of any privileged data." *Cooke,* 83 Cal. App.3d at 592, 147 Cal.Rptr. 915. The trial court fulfilled that duty by ordering the return of any privileged documents and the sealing of any documents in the court file. *Id.*

Of course, unlike the attorney in *Cooke,* Friedman did receive documents subject to a protective order. Friedman's compliance with the protective order *may* require that he recuse himself from representing Plaintiff in this matter. *See Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP,* 69 Cal.App.4th 223, 81 Cal.Rptr.2d 425 (1999). *Morrison* found that the trial court properly disqualified Hancock in a case where a subsidiary of Morrison was the adverse party. The trial court based its decision on the facts that Hancock had previously represented Morrison *and* had previously served as monitoring counsel for Morrison's insured. *Id.* at 231, 81 Cal.Rptr.2d 425. The appellate court concluded that the trial court "could properly take into account the confidential information Hancock received as 'monitoring counsel' in determining whether Hancock should be disqualified." *Id.* at 233, 81 Cal.Rptr.2d 425.

Unlike Friedman, however, Hancock, as "monitoring counsel," was not adverse to Morrison. Unlike Friedman, Hancock in *Morrison* did not receive purportedly privileged documents from an adversary in litigation. Indeed, nothing in *Morrison* equates a monitoring-counsel scenario with a *Cumis*-counsel scenario. The Court, nevertheless, does not reach the question of whether Friedman can personally litigate against Defendant. Friedman has not, and will not, participate in this litigation.

Moreover, even if the Court disqualified Friedman from this litigation, TCZB does not have to be disqualified. Friedman understands that the protective order precludes him from disclosing any privileged information. Friedman asserts he has complied with that obligation and Defendant presents no evidence that Friedman has violated the protective order. TCZB also has instituted screening policies that effectively screen out Friedman from any type of involvement with this litigation. TCZB and Friedman have taken sufficient steps to insure that any of Defendant's privileged information that may be inside Friedman's head will not be communicated to the rest of TCZB.

 As such, it follows that the Court rejects Defendant's argument that disqualification of Friedman necessarily means disqualification of TCZB. Vicarious disqualification of a firm is required only where an attorney is disqualified because he represented the adverse party. *See Flatt v. Superior Court,* 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994); *People v. Speedee Oil Change Systems, Inc.,* 20 Cal.4th 1135, 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999); *Henriksen v. Great American S & L,* 11 Cal.App.4th 109, 117, 14 Cal.Rptr.2d 184 (1992); *William H. Raley Co., Inc. v. Superior Court,* 149 Cal.App.3d 1042, 1048, 197 Cal.Rptr. 232 (1983). In cases where the disqualification request is not based on an attorney-client relationship, "[a]utomatic or mechanical application of the vicarious disqualification rule can be harsh and unfair to both a law firm and its client." *Raley,* 149 Cal.App.3d at 1049, 197 Cal.Rptr. 232. "The better approach is to examine the circumstances of each case in light" of certain factors. *Id.* Thus,

> [t]he court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest.

*Id.* at 1048.

Here, Friedman *may* have received, in an adversary proceeding, privileged information protected under Cal. Civil Code § 2860 and a protective order. TCZB has taken steps to insure that the information is not disseminated within the firm. Considering these facts and the *Raley* factors as applied to this matter, the Court finds that disqualification of TCZB based on Friedman's exposure to purportedly privileged information would be unduly harsh and excessive.

## B. The Heller Connection.

Defendant also argues that the Court should disqualify TCZB because the three attorneys working on this case were previously members of the Heller firm. TCZB mainly argues that because the three attorneys had no involvement in Heller's representation of Defendant that disqualification is not appropriate.

### 1. California law on successive representations.

 Where a potential conflict of interests "arises from the successive representation of clients with potentially adverse interests, ... the chief fiduciary value jeopardized is that of client confidentiality." *Flatt,* 9 Cal.4th at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950.

> Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations.

*Id.* "If the former client can establish the existence of a substantial relationship between representations the courts will conclusively presume the attorney possesses

confidential information adverse to the former client." *H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal.App.3d 1445, 1452, 280 Cal.Rptr. 614 (1991).

Whether a "substantial relationship" between the two representations exists depends on three factors: "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement in the case." *Id.* at 1455, 280 Cal.Rptr. 614 (quoting *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751, 760 (2d Cir.1975) (Adams, J., concurring)); *accord Rosenfeld Const. Co., Inc. v. Superior Court*, 235 Cal.App.3d 566, 576, 286 Cal. Rptr. 609 (1991). The review of the previous representation should consider "the time spent by the attorney on the [matter], the type of work performed, and the attorney's possible exposure to formulation of policy or strategy." *Ahmanson*, 229 Cal. App.3d at 1455, 280 Cal.Rptr. 614. In making its review, the court should also take a pragmatic approach that asks "whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Id.* at 1454, 280 Cal.Rptr. 614.

Plaintiff argues that in applying the substantial relationship test, this Court should look solely to its attorneys' work, or better stated lack of work, on the Heller representation. Thus, Plaintiff urges the Court to disregard Hobel's work in the Heller representation. In support of its position, Plaintiff points to the language of California's Rule 3–310(E) and to *Dieter v. Regents of the University of California*, 963 F.Supp. 908 (E.D.Cal.1997).

Rule 3–310(E) precludes a "member" from accepting a conflicting representations where the "member" has obtained confidential information. Clearly, the Court must look to determine if a "member" has obtained confidential information. However, Rule 3–310(E) does not answer the question of whether the Court should look to Hobel's connection or that of Plaintiff's attorneys.

Plaintiff's argument is actually another variation of its position that its attorneys should not be imputed with Hobel's knowledge. In California, where an attorney is disqualified under the substantial relationship test, that attorney's entire firm is also disqualified. *Flatt*, 9 Cal.4th at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950; *Henriksen*, 11 Cal.App.4th at 117, 14 Cal. Rptr.2d 184. The Court must disqualify the firm because the whole firm is imputed with the knowledge of the confidential information that the attorney presumptively possesses.

*Dieter* demonstrates that Plaintiff's position requires the Court to reject the imputation rule. *Dieter* did look at the involvement of the attorneys whom the adverse party sought to disqualify. 963 F.Supp. at 912. *Dieter* reached that result, however, only after refusing to apply the imputation rule. *Id.* at 911. Accordingly, the first question faced by the Court is whether to apply the vicarious disqualification/imputed knowledge rule to this case.

### 2. The imputation rule is inapplicable to this situation.

Plaintiff points out that *Dieter* is the only case that has addressed the situation presented here: a lawyer litigating against Party A where the lawyer used to be at Firm A at a time when other Firm A attorneys were representing Party A. *Dieter* found that California law did not address this specific scenario and, therefore, it looked to the ABA Model Rules of Professional Conduct. 963 F.Supp. at 911. Under the Model Rules,

> if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and that lawyer later joined another firm, neither the lawyer individually nor the second firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients conflict.

*Id.* at 911 (quoting Model Rules of Professional Conduct Rule 1.9(b), cmt. 8 (1995)).

Because the attorneys in *Dieter* had not been involved in the earlier litigation while at a previous firm, the court refused to vicariously disqualify the attorneys. *Id.*

Defendant argues that the Court should not follow *Dieter* because it "misapplied uncontroverted California law." (Def.'s Mot. at 17 n. 8.) Instead, Defendant asks this Court to follow *Rosenfeld* and *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems*, 809 F.Supp. 1383, 1390 (N.D.Cal. 1992). Neither of those cases, however, involves the factual scenario presented in this matter or in *Dieter*.

In *Rosenfeld*, the disqualified firm, through attorneys that still were at the firm, had represented the former client, Rosenfeld, *in the controversy with the firm's current client*, the Lawsons. *Rosenfeld*, 235 Cal.App.3d at 571, 286 Cal. Rptr. 609. Thus, the *Rosenfeld* court did not face a lawyer whose former firm, through other attorneys, had represented the adverse party.

*Elan* involved a firm suing a former client after the attorney handling that client left the firm. *Elan*, 809 F.Supp. at 1385–86. Under those facts, a court could reasonably presume that some of the remaining lawyers may have had discussions with the former attorney about the client and would have discussions with their fellow attorneys handling the subsequent matter. *See id.* at 1392–93. In contrast, the issue before this court is limited to whether *the former attorney* had conversations about the firm's client. Moreover, a former attorney generally no longer has access to the privileged conversations with those at his former firm. The *Elan* court could also expect that the firm still had a client file that contained privileged material. *See id.* at 1386 n. 5. It is highly unlikely that an attorney leaving a firm would take materials concerning matters on which that attorney did not work.

Thus, neither the *Elan* court nor the *Rosenfeld* court faced the factual scenario presented in this case. The Court also has been unable to find any other case applying California law to this factual scenario. Where a situation is not directly addressed by the California ethic's rules, California courts look to the ABA Model Rules of Professional Conduct for guidance. *See Flatt*, 9 Cal.4th at 282 n. 2, 36 Cal.Rptr.2d 537, 885 P.2d 950; *State Compensation Fund v. WPS, Inc.*, 70 Cal.App.4th 644, 656, 82 Cal.Rptr.2d 799 (1999).[3]

As noted by *Dieter*, the ABA has considered the factual scenario presented in this case and determined that imputed disqualification is not necessary to preserve confidentiality. *Dieter*, 963 F.Supp. at 911.

> Preserving confidentiality is a question of access to information. Access to information, in turn, is essentially a question of fact in particular circumstances, aided by inferences, deductions or working presumptions that reasonably may be made about the way in which lawyers work together. A lawyer may have general access to files of all clients of a law firm and may regularly participate in discussions of their affairs; it should be inferred that such a lawyer in fact is privy to all information about all the firm's clients. In contrast, another lawyer may have access to the files of only a limited number of clients and participate in discussions of the affairs of no other clients; in the absence of information to the contrary, it should be inferred that such a lawyer in fact is privy to information about the clients actually served but not those of other clients.

Model Rules of Professional Conduct Rule 1.9 cmt. 6. The Court finds the Model Rule's reasoning persuasive. Accordingly, the Court will not apply the vicarious disqualification rule. Instead, the Court will

---

**3.** The Central District looks for guidance to the ABA's Model Code of Professional Responsibility. *See* Local Rules, Ch. VI, R. 2.1. The Model Code, however, was superseded by the Model Rules. In any event, the Model Code does not explicitly address former client conflicts of interests. *See Dieter*, 963 F.Supp. at 910 n. 2.

consider Plaintiff's attorneys' actual involvement in the Heller representation to determine whether a "substantial relationship" exists.

### 3. *Bloomgarden and Markowitz.*

 TCZB has the burden of showing that its attorneys acquired no knowledge or information relating to Defendant. *See* Model Rules of Professional Conduct Rule 1.9 cmt. 7. Markowitz clearly satisfies this burden. She declares that she never reviewed any of Defendant's files and never obtained any confidential or privileged information about Defendant. She was also an associate at the Los Angeles office while Hobel worked out of the San Francisco office. As far as she recalls, she had no knowledge of the existence of Hobel and no knowledge that Defendant was Heller's client. Thus, Markowitz shows that she did not have access to nor did she discuss Defendant's affairs while at Heller.

Bloomgarden also satisfies this standard. He did not review Defendant's file at Heller nor have any conversation about Defendant's affairs. Although he was a partner, he, like Markowitz, worked out of the Los Angeles office. Thus, Bloomgarden has shown that he did not have access to nor did he discuss Defendant's affairs while at Heller.

Thus, even assuming that the first two factors of the substantial relationship test are met, Bloomgarden and Markowitz's lack of involvement in the Heller representation precludes a finding that a substantial relationship exists. *See Dieter,* 963 F.Supp. at 912; *Trone v. Smith,* 621 F.2d 994, 998 n. 3 (9th Cir.1980); *Ahmanson,* 229 Cal.App.3d at 1457–58, 280 Cal.Rptr. 614.

### 4. *Tatro.*

 Tatro presents a closer question. Tatro never worked on any of the matters handled by Heller on behalf of Defendant. He, nevertheless, states that he does not "recall or believe that [he] ever, at any time, reviewed any Aerojet client files maintained by Mr. Hobel or Heller Ehrman, obtained any attorney-client privi-

leged information about Aerojet while at Heller Ehrman, or obtained any other confidential Aerojet information while at Heller Ehrman." (Tatro Decl. ¶ 4.) Thus, unlike Markowitz and Bloomgarden, Tatro allows for the possibility that he may have received some privileged information that he does not recall.

Defendant, however, presents no evidence that Tatro actually had conversations with Hobel about Defendant. Unlike the situation where a client is seeking to disqualify his actual former attorney, Defendant can receive, and has received, the cooperation of Hobel. (*See* Hobel Decl.) Thus, Defendant has access to information that could contradict Tatro's recollection. None is presented to rebut Tatro's declaration.

Nevertheless, because Tatro maintained an office in Heller's San Francisco office, the possibility exists that he had some informal discussions with Heller attorneys about the Heller representation. The courts have discussed "the common-sense notion that people who work in close quarters talk with each other, and sometimes about their work." *Elan,* 809 F.Supp. at 1390. The Court would not be surprised to learn that Hobel and Tatro have forgotten some lunchroom discussion touching on privileged information about Defendant. Using the "pragmatic approach" endorsed by *Ahmanson,* the Court finds that Tatro's involvement in the Heller representation, which may have consisted of some lunchroom discussions, is at most peripheral involvement providing for minimal exposure to confidential information about Defendant.

Moreover, any privileged information that Tatro received in those cursory conversations would probably not be material to the present representation. Hobel's principal advice related to legal situations involving (1) a consent decree, (2) a state class action lawsuit, and (3) an insurance coverage claim. Defendants, in its papers and at oral argument, fail to explain how the legal issues in those cases have any

connection to the legal issues in the present lawsuit.[4] The Court is unable to decipher the legal similarities between the Heller representation and the present litigation.

Thus, the second (legal issues) and third (attorney involvement) factors of the substantial relationship test do not support disqualification. Under the circumstances, the Court finds that, although the facts in both representations are similar, a substantial relationship between this litigation and the Heller representation does not exist. Accordingly, disqualification of Tatro is unwarranted.[5]

### III. CONCLUSION

For the reasons articulated herein, the Court DENIES Defendant's motion to disqualify.

**SO ORDERED.**

---

**4.** Indeed, at oral argument, Defendant was unable to describe the legal issues presented by the state class action lawsuit or the consent decree.

**5.** The Court notes that Plaintiff argues that Defendant has waived the purported conflict of interests. The Court finds Plaintiff's argument unpersuasive. The Court, however, does note that Defendant's response to Plaintiff's argument is instructive. TCZB asserts that Tatro has been litigating against Defendant in another lawsuit, *Stringfellow,* and that Defendant did not seek to have TCZB disqualified. Defendant argued that one of the main differences between the *Stringfellow* litigation and this case is that the San Gabriel Basin Water Quality Authority is a party in this case. "A significant part of the privileged information at issue here deals with [Defendant's] close relationship with Plaintiff." (Def.'s Reply at 18–19.) Hobel's advice, however, did not involve the Azusa plant or Plaintiff. Hobel also does not assert that he was privy to information about Defendant's relationship with Plaintiff.