John **HUSTON**, Individually and On Behalf of All Others Similarly Situated, Plaintiff,

v.

**IMPERIAL CREDIT COMMERCIAL MORTGAGE INVESTMENT CORP., et al., Defendant.**

**No. CV00–02751ABCRNBx**

United States District Court, C.D. California.

Dec. 21, 2001.

Bruce C. Fishelman, Alec B. Wisner, H. Scott Leviant, Stanbury & Fishelman, Los Angeles, CA, for plaintiff.

Peter K. Rosen, Christopher P. Murphy, Teresa A. Beaudet, Mayer Brown & Platt, Los Angeles, CA, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

COLLINS, District Judge.

Defendants Imperial Credit Commercial Mortgage Corp. ("ICCMIC"), Mark S. Karlan ("Karlan"), H. Wayne Snavely ("Snavely") and Kevin E. Villani ("Villani") (collectively, "Defendants") filed a Motion to Disqualify Plaintiff's Counsel on August 20, 2001 ("Motion to Disqualify"). Defendants assert that Plaintiff's counsel, Stanbury Fishelman Wisner & Adsit ("Stanbury Fishelman") and Joseph R. Parise ("Parise") should be disqualified and enjoined from any further participation as counsel in the instant action.

After considering the materials submitted by the parties, argument of counsel, and the case file, the Court GRANTS Defendants' Motion to Disqualify.

## I. PROCEDURAL BACKGROUND

The instant motion arises from a securities action filed on March 17, 2000, in which Plaintiff John Huston ("Huston" or "Plaintiff") asserts claims pursuant to Section 11 of the 1933 Securities Act, 15 U.S.C. § 77k, related to the initial public offering ("IPO") of defendant ICCMIC (the "Securities Action"). *See* Motion to Disqualify at 1. Plaintiff is suing ICCMIC and three of the seven ICCMIC directors who signed the ICCMIC initial public offering registration statement. *See* Motion to Disqualify at 1.

On June 7, 2000, the Court denied a motion to dismiss brought by Defendants. Plaintiff subsequently moved for class certification and for the appointment of lead counsel and lead plaintiff ("Motion for Class Certification"). *See* Motion to Disqualify at 1. Defendants opposed Plaintiff's motion on the ground that Plaintiff and his counsel of record, Stanbury Fishelman, had a conflict of interest with the members of the putative class because of their relationship with Parise. According to Defendants, Parise was Plaintiff's brother-in-law, a former officer of ICCMIC, who was personally involved in ICCMIC's IPO and was now acting as both Plaintiff's counsel (although not of record) and co-counsel with Stanbury Fishelman. Defendants also opposed Plaintiff's motion on the ground that Plaintiff's counsel of record, Stanbury Fishelman, was not competent to act as class counsel. *See* Motion to Disqualify at 1.

In addition to opposing Plaintiff's Motion for Class Certification, Defendants moved to strike Plaintiff's class allegations ("Motion to Strike Class Allegations").

This motion was made on the ground that (1) Plaintiff had given defective public notice regarding the action,[1] and (2) neither Plaintiff nor any other putative class member had timely moved to be appointed lead plaintiff. *See* Motion to Disqualify at 1.

The Court struck Plaintiff's Motion for Class Certification on the ground that Plaintiff's public notice of the Securities Action did not comply with 15 U.S.C. § 77z–1(a)(3)(A)(i). *See* Order Denying Defendants' Motion to Strike Class Allegations and Striking Plaintiff's Motion for Class Certification, entered March 27, 2000 ("March 2000 Order"); Motion to Disqualify at 1. The Court ordered Plaintiff to issue a new notice to ICCMIC's 100 largest shareholders to allow such institutional investors the opportunity to move to be appointed as lead plaintiff. *See* Motion to Disqualify at 1–2; March 2000 Order. The Court also found Defendants' Motion to Strike Class Allegations moot and struck that motion.

In accordance with the Court's March 2000 order, Plaintiff issued the required public notice of the instant Securities Action. *See* Motion to Disqualify at 2. Plaintiff also moved to be appointed lead plaintiff and for the appointment of Stanbury Fishelman as lead counsel. *See* Motion to Disqualify at 2. Defendants opposed those motions based on conflict of interest and competence issues, and further argued that Stanbury Fishelman should not be appointed lead counsel because the firm was subject to disqualification as a result of its connections with Parise. *See* Motion to Disqualify at 2. After those motions were fully briefed, the Court informed the parties that the appropriate way to assess

---

**1.** When issuing public notice of the instant action, as required under 15 U.S.C. § 77z–1(a)(3)(A)(i), Plaintiff's counsel included the wrong time period within which a putative class member could move to be appointed lead plaintiff, giving prospective lead plaintiffs less time than they were statutorily permitted under 15 U.S.C. § 77z–1(a)(3)(A)(i)(II). *See* March 2000 Order; Motion to Disqualify at 1.

whether the Stanbury Fishelman should be disqualified was in a motion to disqualify rather than in a motion for appointment of lead plaintiff and lead counsel. *See* Civil Minutes dated July 31, 2001, at 1. The Court ordered Defendants to bring a motion to disqualify Plaintiff's counsel. *See* Civil Minutes dated July 31, 2001, at 2.

On August 20, 2001, Defendants filed the instant Motion to Disqualify Plaintiff's Counsel. Plaintiff opposed on October 9, 2001[2] and Defendants filed their reply on October 23, 2001.[3]

## II. Factual Background

### A. The Relevant Companies

Imperial Credit Commercial Mortgage Investment Corp. ("ICCMIC"), which was organized on or about July 31, 1997, is a Maryland corporation with its principal place of business in California. Imperial Credit Commercial Mortgage Asset Management Corp. ("ICCAMC" or the "Manager"), a California corporation and investment fund, was hired by ICCMIC to select and manage the assets of ICCMIC. The directors of both ICCMIC and ICCAMC, at the time of the IPO, were Snavely, Villani and Karlan. Parise was the managing director and senior vice president of both entities. *See* Prospectus at 41, 51. ICCAMC is a wholly-owned subsidiary of Imperial Credit Industries, Inc. ("ICII"), which was organized in 1986 as a residential mortgage lender. *See* Cpt. ¶ 11.

### B. ICCMIC Initial Public Offering

An initial public offering ("IPO") of approximately 34,500,000 shares of the common stock of ICCMIC was held on or about October 22, 1997. *See* Cpt. ¶ 1. ICCMIC paid the Manager its fees and expenses for investing the monies of ICCMIC. These fees and expenses were set forth in a management contract entered into between ICCMIC and the Manager ("Management Contract"). *See* Cpt. ¶ 27; Deposition of Irwin L. Gubman ("Gubman Dep.") at 90.

ICII organized the group of individuals who would constitute the principal management of ICCMIC and put up the initial capital for ICCMIC. ICII also worked with those who would soon be ICCMIC's officers to retain the investment bankers. All of the officers of ICCMIC were also officers of the Manager. *See* Cpt. ¶ 27. After the IPO, ICCMIC sold shares to ICII. Therefore, ICII was a shareholder of, and through its subsidiary ICCAMC, manager of, ICCMIC. *See* Gubman Dep. at 96.

On March 20, 2000, one business day after the instant lawsuit was filed, the shareholders of ICCMIC approved the merger of ICCMIC into a wholly-owned subsidiary of ICII. On March 28, 2000, the merger transaction was consummated.[4]

---

**2.** Parise filed a separate opposition on October 9, 2001. The Court did not consider this opposition as it constituted an impermissible filing. The only proper opposition was that filed by Plaintiff's counsel. Parise neither sought nor received the Court's permission to file his opposition, which would, if permitted, have constituted an unfair advantage for Plaintiff. In addition, the Court notes that the filing, even had it been permitted was filed in violation of Local Rule 11–6, which establishes that no opposition may exceed 25 pages in length. The opposition filed by Plaintiff contained 25 pages.

**3.** The Court has also fully considered the numerous declarations, exhibits and evidentiary objections submitted by both parties.

**4.** Defendants contend that because of this merger, any judgement against ICCMIC in this action will therefore directly affect ICII because as part of the merger agreement, ICII agreed to indemnify the former directors and officers of ICCMIC for claims against them arising out of their performance of their duties as directors or officers of ICCMIC. *See* Gubman Decl. in Support of Defendants' Reply ("Gubman Decl. II") ¶¶ 2 and 3.

## C. Stanbury Fishelman Wisner & Adsit

Stanbury Fishelman is a law firm and the attorney of record for Parise. In early 2000, Parise engaged the Stanbury Fishelman firm as his attorneys. *See* Motion to Disqualify at 6; Parise Dep. at 7–8, 56–59; Deposition of John Huston ("Huston Dep.") at 104, 230–32. Parise also referred Huston to the Stanbury Fishelman firm. *See* Huston Dep. at 9. Parise and Stanbury Fishelman executed an undated "Memorandum of Understanding" concerning prospective litigation, which stated in pertinent part as follows:

"1. Parise will share information about the prospective litigation with [Stanbury Fishelman].

2. If [Stanbury Fishelman] and Parise agree that the prospective litigation is warranted, they will negotiate in good faith regarding the terms and conditions applicable to their *joint representation* of such litigation.

3. If, for whatever reason, the parties are unable to reach an agreement regarding the terms and conditions applicable to their *joint representation* of such litigation, [Stanbury Fishelman] will not, directly or indirectly, become involved in such litigation, disclose information about the prospective litigation to other law firms, refer claims about it, or otherwise attempt to utilize or exploit any of the information shared by Parise."

Murphy Decl., Ex. I.

Stanbury Fishelman and Parise subsequently entered into a fee-splitting agreement regarding this action. *See* Declaration of Christopher P. Murphy, Ex. J.

## D. Joseph Parise

Parise is an attorney who was admitted to the New York bar in 1984. *See* Deposition of Joseph R. Parise ("Parise Dep.") at 359. Parise worked for four years at two different New York law firms as a tax lawyer and then worked for Salomon Brothers in New York for five years as the vice president for mortgage finance. *Id.* at 359–360, 391–96.

Parise moved to California, was admitted to the California bar around 1995 and was subsequently employed as a managing director at Imperial Credit Industries, Inc. ("ICII") in 1996. *See* Parise Dep. at 360–61, 424. Defendants have submitted declarations stating that Parise, in performing his duties at ICII, gave and received legal advice and at one time issued a legal opinion under New York law.[5] *See* Motion to Disqualify at 3; Declaration of Irwin L. Gubman ("Gubmar Decl.") ¶ 3.

In 1997, Parise became an officer and managing director of both ICCMIC and ICCAMC. *See* Seifert Decl. ¶ 2; Motion to Disqualify at 4. In ICCMIC's IPO docu-

---

Plaintiff argues that this statement is incorrect because the SEC and the 9th Circuit have held that agreements indemnifying directors for violations of Section 11 are void. *See* Evidentiary Objections to and Motion to Strike Portions of the Declaration of Irwin Gubman, citing *Laventhol, Krekstein, Horwath & Horwath v. Horwitch*, 637 F.2d 672 (9th Cir.1980), cert. denied sub nom, *Frank v. U.S. Trust Co.*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975.

The Court need not decide the issue of whether a judgement against ICCMIC will in essence be a judgment against ICII because the terms of the merger agreement are not dispositive on the instant Motion to Disqualify.

5. The Court upholds Plaintiff's objection that this portion of the Gubman declaration is lacking foundation. The Court has only relied upon evidence properly before it and Defendants have not submitted the legal opinion issued under New York law. Therefore, the Court did not rely on this conclusion.

ments, Parise was specifically referenced as managing director and senior vice president of both ICCMIC and ICCAMC In March 1998, Parise was identified by the ICCMIC Board of Directors as one of the five Section 16 of the Securities Exchange Act of 1934 ("Securities Act") officers of ICCMIC and Parise signed a Form 4 pursuant to section 16(a).[6] Parise also became a shareholder of ICCMIC, buying 15,000 shares in the IPO and additional shares in 1998 and 1999. *See* Murphy Decl. Ex.'s D & E.

With respect to ICCMIC's IPO, Parise participated in the drafting of the IPO documents and strategy sessions discussing the IPO, *see* Parise Dep. at 535–40; Seifert Decl. ¶ 3, and made a number of road show presentations for the IPO. *Id.* at 475–96. Parise participated in numerous telephone conferences, meetings and drafting sessions with ICCMIC's outside counsel, and Karlan, who was the director, president, and chief financial officer of ICCMIC. *See* Sonnenschein Nath & Rosenthal ("Sonnenschein") Legal Bill. Parise also responded to questions from the Securities and Exchange Commission ("SEC") relating to the IPO documents. *See id.* Defendants assert that Parise, as an attorney for and an officer of ICCMIC, both gave and received confidential legal and business advice concerning ICCMIC's IPO and IPO documentation. *See* Motion to Disqualify at 4; Karlan Decl. ¶ 6. Those IPO meetings, telephone conference calls and drafting sessions included specific confidential discussions among Parise, Karlan and ICCMIC's outside counsel concerning (1) the management fees which would be payable to ICCAMC by ICCMIC for IC-

CAMC's performance of its services under the Management Agreement, (2) the termination fee payable to ICCAMC by ICCMIC under the Management Agreement and (3) various tax issues that might affect ICCMIC relating to the Management Agreement fee, real estate mortgage investment company ("REMIC") residual interests, phantom income and taxable mortgage pools. *See* Karlan Dep. ¶ 7.

Parise left ICCMIC and ICCAMC in June, 1998. *See* Karlan Decl. ¶ 9. After leaving ICCMIC, Parise participated in discussions with Greenwich Capital, an outside buyer for ICCMIC. *See* Motion to Disqualify at 5; Parise Dep. at 223–32, 285–87.

On February 8, 1999, Parise entered into a Consulting Agreement with ICCMIC. Pursuant to the Consulting Agreement, Parise agreed to keep strictly confidential (a) all information obtained by Parise in the course of his work under the Consulting Agreement, and (b) all trade secrets, data, processes of, and financial and other information (whether or not proprietary) regarding ICCMIC. *See* Karlan Decl., Ex. A ¶ 4.

In early 2000, Parise entered into a Memorandum of Understanding and fee-splitting agreement with Stanbury Fishelman. *See* Section II.C above. The Memorandum of Understanding described possible joint representation in a prospective litigation. The fee-splitting agreement set out Parise's anticipated level of involvement in various aspects of this Securities Action and the share of attorney's fees Parise would receive depending upon the timing and level of recovery, if any, for the

---

**6.** Rule 16a–1(f) under Section 16 of the Exchange Act and Item 401(b) of Regulation S–K provide that a corporation may identify those persons performing policy-making functions for the corporation who constitute "executive officers" and thus are officers for pur-

poses of Section 16 of the Exchange Act. *See* Minutes of Initial Meeting of the Board of Directors of ICCMIC, dated September 22, 1997 at 14. (Confidential Access Limited by Protective Order)

plaintiff class. *See* Murphy Decl. Ex. J. Under the fee-splitting arrangement, Parise's activity in "discuss[ing] facts" and "analyz[ing] causes of action" was listed as "very high". *See* Murphy Decl. Ex. J. Parise's personal share of any legal fees awarded as a result of either settlement or judgment varied from 55% to a minimum of 15%. *Id.* Parise's projected personal share of the legal fees ranged from $180,000 (a 30% share of total fees of $600,000, assuming co-counsel were awarded 30% of a $2 million settlement) to $7.2 million (a 15% share of total fees of $48 million, assuming co-counsel were awarded 20% of a $240 million judgment). *Id.*

Parise's sister has been married to Huston for nine years. *See* Huston Dep. at 68. Parise informed Huston of the ICCMIC IPO and recommended that Huston purchase ICCMIC stock. Huston purchased 1500 shares of ICCMIC stock in the IPO. *See* Motion to Disqualify at 5; Murphy Decl. Ex. F; Huston Dep. 14–15; Murphy Decl. Ex. G; Cpt. ¶ 4.

### E. The Instant Securities Action

On March 17, 2001, Plaintiff filed a complaint individually and on behalf of all others similarly situated, asserting a violation under the Securities Act of 1933 in connection with the IPO of approximately 34,500,-000 shares of the common stock of ICCMIC. *See* Cpt. ¶ 1. Plaintiff brought the action on behalf of a class of plaintiffs consisting of purchasers of the common stock of ICCMIC on or between October 22, 1997 and October 21, 1999. *See id.* Purchases by Plaintiff and members of the class were made pursuant to a registration statement ("Registration Statement") and prospectus ("Prospectus") filed by ICCMIC with the SEC on or about August 1, 1997 and made effective on October 16, 1997. Plaintiff asserts that the Prospectus was given to prospective purchasers of

ICCMIC's common shares at the IPO contains materially false and misleading statements and omits from disclosure material facts and risks, particularly concerning compensation to be paid to ICCAMC under the Management Contract. *See id.* Plaintiff claims that he and the class members were injured, *inter alia,* by the payment of undisclosed compensation to the Manager, by the payment of a termination fee of undisclosed magnitude, and by actions detrimental to ICCMIC taken by persons having undisclosed conflicts of interest and the related decline in the stock price of ICCMIC. *See id.*

### III. Legal Standard

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in the furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every manner pertaining thereto.'" *Metro–Goldwyn–Mayer, Inc. v. Tracinda Corp.,* 36 Cal. App.4th 1832, 1837–38, 43 Cal.Rptr.2d 327 (1995) (citations omitted).

> "The issue of disqualification 'ultimately involves a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility.'"

*Id.* at 1838, 43 Cal.Rptr.2d 327 (quoting *In re Complex Asbestos Litigation,* 232 Cal. App.3d 572, 586, 283 Cal.Rptr. 732 (1991)); *Comden v. Superior Court,* 20 Cal.3d 906, 915, 145 Cal.Rptr. 9, 576 P.2d 971 (1978).

The applicable standards of professional responsibility are found in the Rules of Professional Conduct of the State Bar of California. For purposes of this motion, the applicable standard of conduct is set forth in Rule 3–310, which provides as follows:

> (E) A member shall not, without the informed written consent of the client or

former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment.

▮ In applying Rule 3–310, California courts distinguish between successive representations and simultaneous representations. *See Flatt v. Superior Court,* 9 Cal.4th 275, 283–84, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994). Where the potential conflict is "one that arises from the successive representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client confidentiality." *Id.* In this context, the governing test requires that the "[former] client demonstrate a 'substantial relationship' between the subjects of the antecedent and current representations." *Id.*

▮ In applying the "substantial relationship" test, "courts focus less on the meaning of the words substantial and relationship and look instead at the practical consequences of the attorney's representation of the former client." *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.,* 229 Cal.App.3d 1445, 1453, 280 Cal.Rptr. 614 (1991). "The courts ask whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Id.* (citation omitted). To this extent, courts

should focus on the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases. As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy.

*Id.* (citing *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 760 (2d Cir.1975) (Adams, J. Conc.)).

▮ Furthermore, in a class action context, disqualification is more likely because putative class counsel are subject to a "heightened standard" which they must meet if they are to be allowed by the Court to represent absent class members. As explained by one district court:

> *The fact that [counsel] seek to represent a national class of plaintiffs makes the decision to disqualify even more compelling* ... In the class action context, the Court has an obligation to closely scrutinize the qualifications of counsel to assure that all interests, including those of as yet unnamed plaintiffs are adequately represented. See Fed.R.Civ.P. 23(a)(4) (representative parties must 'fairly and adequately represent the interests of the class'). This is because in certifying a class action, the Court confers on absent persons the status of litigants and 'creates an attorney-client relationship between those persons and a lawyer or group of lawyers.' [Citations.] *Precisely because of the responsibility to absent class members, counsel's qualifications in the class action context are subject to a 'heightened standard.'* [Citations]. (Emphasis added).

*Palumbo v. Tele–Communications, Inc.,* 157 F.R.D. 129, 132–33 (D.D.C.1994) (emphasis added), cited and quoted with approval in *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.,* 52 Cal.App.4th 1, 11–12, 60 Cal.Rptr.2d 207 (1997).

## IV. Analysis

Defendants assert that Plaintiff's counsel, Stanbury Fishelman should be disqualified and enjoined from any further participation as counsel in the instant action. Defendants base their motion on the fol-

lowing grounds: (1) Parise is a former attorney for and officer of ICCMIC who received confidential information from ICCMIC concerning the subject of this action, ICCMIC's IPO and the IPO documentation, (2) Stanbury Fishelman is tainted by its relationship with Parise and should not be permitted, as Parise's attorneys and co-counsel in this matter, to do what Parise himself would not be allowed to do, (3) disqualification is required even if the Court finds that Parise did not act as an attorney in ICCMIC's IPO and (4) Stanbury Fishelman is not competent, has not been candid with the Court and is not qualified to represent a shareholder class in a securities class action. *See* Motion to Disqualify at 3.

Plaintiff opposes Defendants' Motion on the ground that: (1) Parise never had an attorney-client relationship with ICCMIC, (2) ICCMIC had no reasonable expectation of privacy as to information concerning the IPO, (3) Parise's relationship with ICII can not justify his disqualification (4) Parise's relationship with ICCMIC does not justify his disqualification, (5) there is no legal basis for disqualifying Stanbury Fishelman and (6) the instant motion is frivolous and should be judicially estopped.

After a careful analysis of each of these arguments and the specific facts of this case, the Court expresses the same sentiment invoked by Judge Tevrizian in *Packard Bell NEC v. Aztech Systems Ltd.*, 2001 WL 880957 (C.D.Cal.2001):

> "the sequence of events in this case does not allow it to neatly fit within the strictures of Rule 3–310 ... 'it is a square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases.' (internal quotations and citation omitted). Nevertheless, the Court finds that the situation presented constitutes a vio-

lation of Rule 3–310 ... the American Bar Association Model Code of Professional Responsibility provides that '[a] lawyer should avoid even the appearance of impropriety.'" *Id.* at *9.

Like Judge Tevrizian, this Court finds that the facts of this case constitute a square peg which does not fit into the round holes of the rules generally applied in attorney disqualification cases. This Court is also mindful that it "must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a continuing effect on the proceedings before the court." *Id.* at *9 (citing *Gregori v. Bank of America*, 207 Cal.App.3d 291, 309, 254 Cal.Rptr. 853 (1989)).

Accordingly, the Court finds that disqualification is appropriate under the circumstances of this case.

## A. Parise Should Be Disqualified Because of his Role as Co–Counsel for Huston and his Representation of ICCMIC during the IPO

### 1. Role as Co–Counsel and Representation During the IPO

As an initial matter, the Court finds that while Parise is not listed as counsel of record for Huston in the instant matter, he has indeed acted as co-counsel in this matter. The "Memorandum of Understanding" executed by Parise and Stanbury Fishelman (the "Memorandum") refers to litigation that may be *jointly handled* by Stanbury Fishelman and Parise. While the Memorandum is not dated and does not specifically identify the litigation it contemplated, it is clear that the instant Securities Action was the litigation

considered in that document.[7] In the Memorandum, Parise agrees to share information with Stanbury Fishelman that will enable it to evaluate the prospective litigation and negotiate the terms and conditions applicable to their *"joint presentation"* of the litigation. *See* Memorandum at ¶ 2. In addition, the fee-splitting chart which outlines Parise's involvement in the litigation makes it clear that Parise would be involved in activities generally executed by an attorney. For instance, the chart indicates that Parise's involvement in drafting the complaint, sending an unfiled complaint to defendants, engaging in preliminary fact finding, and conducting key depositions and requests for admissions or denials would be "high." The declaration by Huston further supports that Parise did indeed draft the complaint.[8] *See* Huston Dep. at 11. In addition, Parise's participation in analyzing the causes of action and negotiation would be "very high." [9] *See* Murphy Decl., Ex. J.

Plaintiff's counsel of record, Stanbury Fishelman, has indicated that Parise is no longer acting as co-counsel in the Securities Action. Scott Leviant, an attorney from Stanbury Fishelman, stated in his declaration that "Parise has voluntarily suspended all activity and involvement as co-counsel in this matter." *See* Leviant Decl. ¶ 4. Leviant further asserts that Stanbury Fishelman has suspended all direct communication with Parise.

Defendants persuasively argue that Leviant's declaration fails to establish that Parise is no longer involved in the Securities Action as co-counsel. First, Stanbury Fishelman has not asserted that the fee-splitting agreement is no longer in effect. Second, Leviant only stated that Stanbury Fishelman has suspended all *direct* communication with Parise, leaving open the possibility that Fishelman may be *indirectly* communicating with Parise. Moreover, any voluntary suspension of communication at this stage does not remedy Parise's prior disclosures to Stanbury Fishelman of ICCMIC's confidential information. *See* Motion to Disqualify at 6, fn. 5.

■ Having determined that Parise has acted as co-counsel for Huston in the Securities Action, the Court now turns to the question of whether Parise represented ICCMIC during the IPO. Defendants contend that Parise was a former attorney for ICCMIC who was the recipient of confidential communications from ICCMIC concerning the subject matter of the in-

---

7. The first recital of the Memorandum states: "Whereas, Parise has information regarding alleged securities law violations and other possible unlawful acts by a Maryland company whose corporate headquarters are in the State of California." Given the fact that ICCMIC is a Maryland company with headquarters in California, the Court finds that the matter referred to in the Memorandum is that of the instant Securities Action.

8. As stated by the court in *The People ex rel. Dept. of Corp.'s v. SpeeDee Oil Change Systems, Inc., et al.*, 20 Cal.4th 1135, 1148, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999), "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." Parise's drafting of the complaint in the action brought by Huston evidences the fact that Huston received legal advice from Parise concerning the Securities Action.

9. Defendants also suggest that in addition to Parise's role as co-counsel with Stanbury Fishelman, Parise has a direct attorney-client relationship with Huston. While there is no direct evidence in the record showing a direct, exclusive attorney-client relationship between Huston and Parise, Huston's deposition suggests that Parise was in fact acting as counsel for Huston in the instant matter. For instance, Huston states that he understood that Parise had either drafted the complaint for the Securities Action himself or drafted it with other people. *See* Murphy Decl.; Ex. A Huston Dep. at 11.

stant litigation, namely, ICCMIC's IPO, the Management Agreement between ICCMIC and ICCAMC and the termination fee payable to ICCAMC by ICCMIC under the Management Agreement. *See* Motion to Disqualify at 9. Defendants maintain that Parise's activities with ICCMIC and subsequent representation of Huston are straightforward violations of Rule 3–310(E) of the California Rules of Professional Conduct. Plaintiff asserts that Parise was not an attorney for ICCMIC during the IPO because ICCMIC did not have any employees and Parise was not listed as an attorney in the "Legal Matters" section of the IPO prospectus.[10]

 While Parise was technically employed by ICII, the Court finds that his activities with ICCMIC amount to activities performed by an attorney representing ICCMIC. *See Agran v. Shapiro*, 273 P.2d 619, 127 Cal.App.2d Supp. 807 (1954) (finding that the "practice of law" need not be an independent vocation; it may be incidental to another occupation of a nonlegal nature). Parise participated in the drafting of the IPO documents, strategy sessions discussing the IPO, *see* Parise Dep. at 535–40, and made a number of road show presentations for ICCMIC's IPO. *See* Parise Dep. at 475–96. More

specifically, Parise engaged in dozens of lengthy telephone conference calls, meetings and drafting sessions with Karlan and ICCMIC's outside counsel and responded to questions from the SEC relating to the drafting of the IPO documents. Indeed, Karlan, the Chief Executive Officer of ICCMIC, has represented that aside from himself, Parise was the principal person at ICCMIC involved in the drafting of ICCMIC's IPO documents. *See* Reply at 4; Karlan Decl. 5. Karlan has also declared that Parise both "gave and received confidential legal and business advise concerning ICCMIC's IPO and the IPO documentation." *See* Karlan Decl. ¶ 6.[11] Additionally, in Parise's July 18, 1997 report to Snavely and Villani regarding his progress since having started the structured finance group at ICII, Parise implies that he did indeed perform legal work for ICII when he refers to the legal expertise that he brings to the company. Parise writes, "[b]ecause of my experience and expertise in law, tax and accounting, I am uniquely able to bring a higher degree of focus on these issues. While not sacrificing profitability, we have substantially improved [ICII's] position with regard to issues such as securities law liability, certainty of tax and accounting treatment, indemnification,

---

**10.** The Court rejects Plaintiff's unsubstantiated claim that Parise could not be an attorney for ICCMIC because ICCMIC did not have employees. It appears that people performing work for ICCMIC, which was not incorporated until July 31, 1997, were paid initially by ICII and then by the Manager. *See* Karlan Dep. at 26–30. The Prospectus stated that ICCMIC would not employ full-time personnel and instead would rely on the facilities, personnel and resources of the Manager to conduct its operations. *See* Prospectus at 46. The fact that Parise was not listed as an "employee" of ICCMIC does not mean that he could not have been ICCMIC's attorney. In addition, Parise received stock options from ICCMIC. *See* Murphy Decl., Ex. D at 2. Parise was the second most highly compensated

officer of ICCMIC in terms of stock options at the time of ICCMIC's IPO. *See* Murphy Decl., Ex. C at 6.

**11.** The Court notes Plaintiff's objection that Karlan's statement is vague and ambiguous and that Karlan was unable to identify the substance of even a single, solitary confidential matter discussed in calls, meetings or drafting sessions that was not publicly disclosed in one form or another. *See* Evidentiary Objections to Karlan Decl. at 6. However, the Court finds that the other evidence, such as legal bills from ICCMIC's outside counsel and documents executed by Parise, supports Karlan's statement.

etc." [12] *See* Gubman Decl., Ex. B. While this statement was made with respect to ICII, not ICCMIC, it indicates that Parise was indeed performing legal work.

In addition, Parise's continuing affiliation with ICCMIC under the Consultant Agreement, dated February 8, 1999, suggests that Parise had performed legal work for ICCMIC in the past. On March 2, 1999, Parise sent an invoice to ICCMIC in which he seeks payment for "document review including the indenture, deposit trust agreement and the administration agreement and providing general business and *legal advice* regarding the securitization of commercial and multifamily loans, including discussing alternative methods of documenting the bonds..." [13] *See* March 2, 1999 Parise Letter, Karlan Decl. II, Ex. Parise added "as is *customary* with our dealings, I provide suggestions, alternatives and advice..." *Id.* While Parise provided services under the Consultant Agreement after the IPO, his statement that the activities he performed under the Consultant Agreement were "customary" with his dealings with ICCMIC strongly suggests that he was retained to perform services he had performed for ICCMIC in the past. As stated by Parise, these *customary* services include legal advice.

The absence of Parise's name in the "Legal Matters" section, Plaintiff argues, is persuasive evidence that Parise did not provide legal services in connection with the IPO. *See* Opposition at 15. However, the "Legal Matters" section of the IPO does not purport to provide an exhaustive listing of all the lawyers who worked on the IPO, nor does it purport to describe all of the legal work done in connection with the IPO. The "Legal Section" of the prospectus (1) identifies outside law firms who worked on the IPO and (2) identifies the law firms who were providing opinions as the validity of the common stock being offered.[14] *See* Motion to Disqualify at 12. Since Parise was not outside counsel for the IPO, nor was he providing an opinion as to the validity of the common stock offered, an inclusion of his name in this section would not have been required.

Plaintiff argues that this case is similar to *Strasbourger Pearson Tulcin Wolff Inc., et al. v. Wiz Technology, Inc.,* 69 Cal. App.4th 1399, 82 Cal.Rptr.2d 326 (1999), where the court found that no attorney-client relationship existed between Wiz, the company conducting the IPO, and the underwriters counsel involved in the IPO. Wiz had paid, the underwriters counsel, Stroock, Stroock & Lavan ("Stroock"), fees for conducting blue sky compliance with respect to the IPO. The court based its decision on (1) the fact that the underwriting agreement provided that Wiz would be the underwriters counsel for blue sky compliance and (2) the custom of parties in

---

12. The Prospectus identifying Parise as an officer of ICCMIC, as well as a tax attorney specializing in mortgage-backed securities, further suggests that Parise performed legal work for ICCMIC.

13. Parise's March 10, 1999 invoice contains the same language. *See* March 2, 1999 Parise Letter, Karlan Decl. II, Ex. B.

14. The "Legal Matters" Section of the ICCMIC's IPO prospectus states as follows: "The validity of the Common Stock offered in the Offering will be passed upon for the Company by Sonnenschein Nath & Rosenthal, Los An-

geles, California, and for the Underwriters by Hunton & Williams, Richmond, Virginia. Sonnenschein Nath & Rosenthal will be relying as to matters of Maryland law on the opinion of Piper & Marbury L.L.P. Cadwalader, Wickersham & Taft will provide certain legal services on behalf of the Company in connection with the Offering. Mr. Norbert M. Seifert, Senior Vice President of the Company and the Manager, was a partner at the law firm of Sonnenschein Nath & Rosenthal and resigned from the law firm in September 1997." Prospectus at 150.

stock underwriting transactions. The court also emphasized the "absence of any express representation by [underwriters counsel]" as evidence that no attorney-client relationship existed between the company conducting the IPO and underwriters counsel. *Id.* at 1405, 82 Cal. Rptr.2d 326. While Plaintiff may argue that Parise's participation in the IPO, similar to that of Stroock in *Strasbourger*, consisted of activity that was "customary" of an officer of the company issuing the IPO, the Court finds that the two situations are different. While it may be customary in IPO offerings for an officer to contribute business advice to the drafting of the prospectus, there are declarations by both Karlan and Seifert, who was corporate secretary and senior vice president of ICCMIC, that Parise contributed legal and business advice, as well as a bill from Sonnenschein which further indicates that Parise contributed legal advice. This evidence, combined with the fact that Parise was designated an officer with policy-making functions, as discussed below, owed a heightened fiduciary duty to ICCMIC distinguishes Parise's role in the IPO from that of Stroock in *Strasbourger.*

### 2. Confidential Information

■ Defendants contend that during Parise's activities relating to the IPO process, Parise received confidential information. While Parise claims that he did not obtain any confidential information from ICCMIC and that he never conveyed confidential information to Stanbury Fishelman, the Court finds that Defendants have sufficiently identified specific confidential

communications to which Parise was a party. *See* Opposition at 17. The declaration by Karlan, as well as the legal bills from Sonnenschein Nath & Rosenthal ("Sonnenschein"), ICCMIC's outside counsel for the IPO, show that the IPO meetings, telephone conference calls and drafting sessions in which Parise participated included specific confidential discussions among Parise, Karlan and ICCMIC's outside counsel concerning (1) the management fee which would be payable to ICCAMC by ICCMIC for ICCAMC's performance of its services under the Management Agreement, *see* July 11, 1997 Legal Bill; Karlan Decl. II ¶ 7, (2) the termination fee payable to ICCAMC by ICCMIC under the Management Agreement, *see* July 14, 1997 Legal Bill; Karlan Decl. ¶ 7 and (3) various tax issues that might affect ICCMIC relating to the Management Agreement termination fee, real estate mortgage investment company ("REMIC") residual interests, phantom income and taxable mortgage polls. *See* July 14, 1997 Legal Bill; Karlan Decl. 5.[15] Karlan understood that the contents of all of those discussions were privileged and confidential and would be kept confidential by all of the participants, including Parise. *See* Motion to Disqualify at 5; Karlan Dep. ¶ 8. The Court also notes Defendants observation that Parise has not submitted a sworn declaration indicating that he did not participate in confidential communications concerning ICCMIC's IPO. *See* Reply at 14.

Finally, in the Consultant Agreement between Parise and ICCMIC entered on February 8, 1999, Parise agreed to keep

---

**15.** For instance the July 18, 1997 entry by Mr. Seifert states, "telephone conferences, M. Karlan and J. Parise re: ICII-related questions relative to S–11." The July 17, 1997 entry by Mr. Seifert states, "telephone conference, J. Parise, M. Karlan, A. Weil re: various SEC issues related to filing of S–11." July 17, 1997 entry by A. Weil states, "Call with Karlan, NMSeifert and Parise re: asset dollar amount disclosure for filing. (sic)" The July 14, 1997, entry by N. Seifert, "telephone conference, R. Lipton, M. Karlan and J. Parise re: various tax issues, particularly fee on termination of Management Agreement."

all information he obtained in the course of his work under the Consultant Agreement strictly confidential. Thus, Paris may have continued to receive confidential information even after his work for ICII during the IPO.

### 3. Substantial Relationship between the Two Representations

■ While the Court has found that Defendants have provided the Court with specific examples of confidential information received by Parise, this Court need not specifically determine that Parise actually *received* confidential information from ICCMIC because the determinative issue is whether a "substantial relationship" exists between Parise's current representation of Huston and his prior representation of ICCMIC. As stated by the Ninth Circuit,

"it matters not whether confidences were in fact imparted to the lawyer by the client. The substantial relationship between the two representations is itself sufficient to disqualify...The test does not require the former client to show that actual confidences were disclosed...It is the possibility of the breach of confidence, not the fact of the breach, that triggers disqualification."

*Trone, et al. v. Smith, et al.,* 621 F.2d 994, 999 (9th Cir.1980). This principle has also been followed by California courts, which have held that where there is a substantial relationship, "access by the attorney in the course of the first representation to confidential information...is *presumed* and disqualification of the attorney's representation of the second client is mandatory." *Flatt,* supra, 9 Cal.4th at 283, 36 Cal. Rptr.2d 537, 885 P.2d 950; *see also Henriksen v. Great American Savings & Loan,* 11 Cal.App.4th 109, 114, 14 Cal. Rptr.2d 184 (1992) ("If the former client establishes an existence of a substantial relationship between the two representations the court will conclusively presume that the attorney possesses confidential information adverse to the former client and order disqualification.")

■ Whether a "substantial relationship" between the two representations exists depends on three factors: "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement in the case." *Ahmanson,* 229 Cal.App.3d at 1455, 280 Cal.Rptr. 614 (quoting *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 760 (2d Cir.1975) (Adams, J., concurring)); *accord Rosenfeld Const. Co., Inc. v. Superior Court,* 235 Cal.App.3d 566, 576, 286 Cal.Rptr. 609 (1991). The review of the previous representation should consider "the time spent by the attorney on the [matter], the type of work performed, and the attorney's possible exposure to formulation of policy or strategy." *Ahmanson,* 229 Cal.App.3d at 1455, 280 Cal.Rptr. 614. In making its review, the court should also take a pragmatic approach that asks "whether confidential information material to the current dispute would normally have been imparted to the attorney by virtue of the nature of the former representation." *Id.* at 1454, 280 Cal.Rptr. 614.

■ The Court finds that Parise's work on the IPO was "substantially related" to instant Securities Action. The factual situations and the legal questions posed are almost identical to the central issues in the Securities Action which involve the descriptions in ICCMIC's IPO documents concerning (1) the management fees to be paid by ICCMIC to ICCAMC under the Management Agreement and (2) the termination fee to be paid by ICCMIC to ICCAMC under the Management Agreement. *See* Cpt. ¶¶ 28–60. Parise clearly participated in discussions of both

of these issues. *See* July 11, 1997 Legal Bill at 8, 10; Karlan Decl. ¶ 7. Plaintiff has also questioned the adequacy of ICCMIC's description of risk factors and conflicts of interest. *See* Cpt. ¶¶ 56, 61–76. Parise specifically participated in the drafting of the risk factors and the conflicts of interests section. *See* Karlan Dep. at 62–63. Moreover, Parise has not submitted a sworn declaration that he did not work on these matters.

The nature of Parise's involvement in both the IPO and the Securities Action indicates that a substantial relationship exists between the two representation. Parise was directly involved in drafting the IPO for ICCMIC and was involved in drafting the complain and conducting preliminary fact finding in the Securities Action. Thus, the nature of Parise's role in both representations enabled him to affect the structure of both actions.

 The Court rejects Plaintiff's argument that Parise could not have received confidential information because the lead underwriters and their counsel were present at some of the IPO discussions. *See* Opposition at 17. As an initial matter, Plaintiff has not indicated which meetings were attended by the third-parties and which were not. To the extent that the underwriters and their counsel were present at some of the IPO meetings, ICCMIC did not waive any privileges or confidences because the underwriters and their counsel were necessary to facilitate the execution

of the IPO. *See* California Evidence Code §§ 912(d), 952 ("A disclosure in confidence of a communication that is protected by a privilege by Section...954...*when such disclosure is reasonably necessary* for the accomplishment of the purpose for which the...lawyer...was consulted, is not a waiver of the privilege."). Plaintiff's reference to *Ahmanson* as support for his proposition that the presence of the third-parties at the IPO meetings constituted a waiver of any expectation of confidentiality is unpersuasive.

In *Ahmanson*, a company, Bowery, hired a law firm to provide it with credit risk advice on the advice Bowery had received from First Boston regarding interest rate risks. The court held that the presence of representatives from First Boston at meetings where a law firm was advising its client negated the possibility that the law firm received privileged information from the client at those meetings. Unlike the instant case, First Boston was not a *necessary* party to achieve the goal of those meetings, which was to advise the law firm' client on advice given by First Boston. In the instant case, the underwriters were necessary to complete the IPO.[16]

### 4. Employment By ICII vs. ICCMIC

Parise further contends that the fact that he was employed by ICII does not mean that he worked for ICCMIC. Parise

---

**16.** Finally, "[t]he central inquiry in determining whether a prospectus is materially misleading under...Section 11 is... 'whether defendants' representations, taken together and in context, would have [misled] a reasonable investor' about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 761 (2d Cir.1991) (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990)) *cert. denied* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052

(1991). Thus, an alleged Section 11 violation must be determined in the context of the entire IPO documentation. As stated previously, Parise actively participated in discussions concerning ICCMIC's IPO and IPO documentation and participated in drafting and revising many aspects of the IPO prospectus. Parise was also involved in dozens of confidential discussions concerning every aspect of the IPO and its documentation. *See* Karlan Decl. ¶¶ 5–8; Seifert Decl. ¶¶ 3–5.

argues that the duty of loyalty owed by an attorney to a former corporate client does not extend to a parent, subsidiary or otherwise affiliated corporation. Parise cites to *Brooklyn Navy Yard Cogeneration Partners, LP, et al. v. Superior Court,* 60 Cal.App.4th 248, 256, 70 Cal.Rptr.2d 419 (1997) as support for this proposition.

The conflict issue in *Brooklyn Navy Yard* was whether a firm should be disqualified from representing the defendant in a dispute of a construction project in New York because it had represented affiliates and subsidiaries of one of the plaintiffs in various matters in Russia. All of the Russian matters were concluded except for one construction case involving a subsidiary, and all of those matters were "concededly unrelated" to the New York case. *See Brooklyn Navy Yard,* 60 Cal. App.4th at 251, 70 Cal.Rptr.2d 419. The Court found that because the subsidiary was not an alter ego of the parent, the attorney's duty of loyalty to the subsidiary did not bar the attorney from representing an interest adverse to the client's parent.

■ The facts in the instant matter are distinguishable from those in *Brooklyn Navy.* Here, among other things, Parise has received information from ICII which is substantially related to the Securities Action against ICCMIC. Also, prior federal cases and a subsequent California case have rejected the *Brooklyn Navy* court's strict adherence to the "alter ego" test. The Court adopts the reasoning of these courts, which determine whether a conflict exists by considering whether a subsidiary is an "alter ego" of the parent, as well as whether (1) there is a "unity of interest" between the subsidiary and the parent sufficient to treat them as one entity for purposes of the alleged conflict and (2) information from the prior representation of the parent or subsidiary was "substantially related" to the issues in the current representation. *See Morrison Knudsen Corp. et al. v. Hancock, Rothert & Bunshoft, LLP et al.,* 69 Cal.App.4th 223, 227, 81 Cal.Rptr.2d 425 (1999); *Baxter Diagnostics Inc. v. AVL Scientific Corp., et al.,* 798 F.Supp. 612, 616 (C.D.Cal.1992).

The case most relevant to the instant matter is *Morrison.* In *Morrison,* a parent corporation, Morrison, sought to enjoin a law firm from representing a county water district in an action against one of the parent's subsidiaries, Centennial Engineering, Inc. The law firm had represented the parent, Morrison, in professional and negligence claims and at the time of the motion for disqualification was representing the parents' underwriters. The Court found that the law firm should be disqualified from representing the water district in the action against the subsidiary. The Court based its decision on the fact that (1) in the course of the firm's work involving the parent corporation, it had received confidential information which was substantially related to the present claim against the subsidiary, (2) the parent controlled the legal affairs of the subsidiary and (3) the operations and management personnel of the parent and affiliate were highly integrated. *See id.* at 245–246, 81 Cal.Rptr.2d 425.

■ The facts of the instant case are similar to those of *Morrison.* The confidential information received by Parise during the course of the IPO—namely, information concerning the management and termination fees which would be payable to ICCAMC by ICCMIC and various tax issues that might affect ICCMIC—is related to the instant litigation. The focus of the instant litigation is the compensation to be paid by ICCMIC to ICCAMC under the Management Contract. *See* Cpt. at 1. In addition, the operations and management personnel of ICII and ICCMIC are highly

integrated. For instance, Snavely, Karlan and Villani are the directors of both ICII and ICCMIC. Snavely is also the chair, president and CEO of ICII and the chairman of the board for ICCMIC. Irwin Gubman is the general counsel of ICII and the secretary of ICCMIC.

Defendants also contend that disqualification of Parise would be appropriate even if the Court applied the more restrictive alter-ego test applied in *Brooklyn Navy.* ICCMIC merged into a subsidiary of ICII on March 28, 2000. Therefore, as of March 28, 2000, ICCMIC has not been an operating entity, its officers and directors are all ICII personnel and there have been no meetings of ICCMIC's board of directors. ICCMIC has been in liquidation by the officers of ICII for the last year. All of ICCMIC's officers, directors or employees are full-time employees of ICII and none of them are paid by ICCMIC. *See* Gubman Decl. ¶ 4.

## B. Parise Should Be Disqualified Because of his Fiduciary Duty as an Officer of ICCMIC

■ The Court finds disqualification appropriate because of Parise's legal activities for ICCMIC during the IPO, his role as co-counsel in the instant Securities Action and because of Parise's fiduciary obligations to ICCMIC.[17] "Fiduciary obligations and professional responsibilities may warrant disqualification of counsel in appropriate cases even in the absence of a strict contractual attorney-client relationship." *Trone v. Smith,* 621 F.2d 994, 1002 (9th Cir.1980), citing *Westinghouse Elec-*

*tric Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311 (7th Cir.), cert. denied, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978).

■ It is undisputed that Parise was an officer of ICCMIC and ICCAMC as Parise was listed in the Prospectus as Managing Director and Senior Vice President of both companies. *See* Prospectus at 41 & 51. It is also clear that Parise fell into the category of officers who owe a heightened fiduciary duty to their company. *See* Minutes of Initial Meeting of the Board of Directors of ICCMIC, dated September 22, 1997 at 14. (Confidential Access Limited by Protective Order). Under California law, "an officer who participates in management of the corporation, exercising some discretionary authority, is a fiduciary of the corporation as a matter of law. Conversely, a 'nominal' officer with no management authority is not a fiduciary." *GAB Business Services, Inc. v. Lindsey & Newsom Claim Svcs., Inc., et al.,* 83 Cal. App.4th 409, 420–21, 99 Cal.Rptr.2d 665 (2000). Given Parise's titles of Managing Director and Senior Vice President[18], as well as his designation as an ICCMIC executive officer who performed policymaking functions for purposes of Section 16 of the Exchange Act, his active involvement in drafting the documents for ICCMIC's IPO, and his role in negotiating, drafting and revising a $500 million line of credit with Morgan Guarantee Trust Company of New York, *see* Karlan Dep. at 91–92, it is clear that Parise's role as officer amounted to that of an officer capable of

**17.** While Parise is not involved in a traditional attorney-client relationship with ICCMIC, the duties performed by Parise constituted duties that are often performed by attorneys. In addition, the high potential for receipt of confidential information and the similarity of issues Parise dealt with in the IPO and the Securities Action, combined with Parise's role

as an officer of ICCMIC, impose a heightened fiduciary duty on Parise with respect to ICCMIC.

**18.** The Court notes that the three officers listed with Parise were only given the title of Senior Vice President. *See* Prospectus at 41 & 51.

exercising discretionary authority over ICCMIC.

The findings of the Court in *Robert Allen, et al. v. Academic Games Leagues of America, Inc., et al.*, 831 F.Supp. 785 (C.D.Cal.1993) are instructive in the instant matter. In *Allen*, Defendants' attorney, Wright, had worked for plaintiff as a law student and subsequently as an advisory board member and as a chairman of one of plaintiff's committees. Wright was admitted to the Illinois bar while working for plaintiff. The Court found that due to Wright's position on the advisory board, it was likely that he had been privy to plaintiffs' confidential information. Wright was disqualified because of his extensive and lengthy involvement with plaintiffs, his failure to resign in a timely fashion and his personal involvement with the representation of defendants.

 Similarly, it is appropriate to disqualify Parise in the instant action because of his extensive involvement with ICCMIC, in which he received confidential information, and his personal involvement with the representation of Huston. The fact that Parise resigned from his office in 1998 does not alter the appropriateness of Parise's disqualification since he had a continuing duty to protect confidential information.[19]

It is also clear that Parise's role as officer created an expectation that he owed a fiduciary duty to ICCMIC. *William H.*

*Raley Co. v. Superior Court*, 149 Cal. App.3d 1042, 197 Cal.Rptr. 232 (1983), is instructive in this matter. In *Raley*, plaintiff's law firm was disqualified because one of the firm's partners was a director of a bank and a member of the bank's trust committee which managed a trust of the defendant's property. The court reasoned that the trustee had a fiduciary duty to the trust and that his firm's representation of a client with interests adverse to those of the defendant would constitute a breach of that duty. The court held:

"[A] conflict of interest [under 5–102(B) ] may arise from an attorney's relationship with a nonclient. Such conflict of interest may arise [1] where an attorney's relationship with a person or entity creates an expectation that the attorney owes a duty of fidelity. It may also arise [2] where the attorney has acquired confidential information in the course of such a relationship which will be, or may appear to the person or entity to be, useful in the attorney's representation in an action on behalf of a client."

*Id.* at 1046–47, 197 Cal.Rptr. 232.

Here, ICCMIC reasonably expected Parise to act in accordance with the fiduciary duty resulting from his role as managing director, senior vice president of ICCMIC and ICCAMC and section 16 officer of ICCMIC. Parise's role as officer and as subsequent co-counsel in the Secu-

---

**19.** The Court notes the observation made by the court in *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc., et al.*, 83 Cal.App.4th 409, 421, 99 Cal.Rptr.2d 665 (2000) that an officer divests himself of his fiduciary duty when he resigns his office. However, officers are also charged with a continuing duty to protect privileged and confidential information, which continues even after they leave the company. *See Packard Bell NEC, Inc. v. Aztech Systems*, 2001 WL 880957 at *8. In addition, the Court in *Allen*

*v. Academic Games Leagues of America, Inc.*, 831 F.Supp. 785, 789 (C.D.Cal.1993), noted that a conflict may arise when an officer/attorney receives confidential information even if the officer/attorney resigned from his employment.

Therefore, even though Parise resigned from his office in 1998, his duty to protect confidential information continues and prevents him from sharing that information with co-counsel Stanbury Fishelman in a litigation against ICCMIC.

rities Action creates a conflict of interest which further supports the need to disqualify Parise from the instant action. Furthermore, disqualification is proper where, "as a result of a prior representation or *through improper means,* there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation." (emphasis added) *See Packard Bell,* 2001 WL 880957 at *9.

Plaintiff refers the Court to *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Livingston,* 566 F.2d 1119 (1978) for the proposition that Parise's title of senior vice president and managing director is insufficient to impose fiduciary liability on Parise. In *Merrill,* the defendant was one of forty-eight (48) securities salesmen at Merrill Lynch with the title of "Account Executive" who was awarded the title of "vice president" because of his outstanding sales records. The court found that in spite of his title, Parise was not an officer with access to inside information within the purview of section 16(b). Even though defendant had been awarded the new title, the defendant had exactly the same duties after he was awarded the title as he did before the recognition. The defendant never acquired executive or policy making duties and all executive and organizational functions of the company were performed by approximately 350 "Executive Vice Presidents."

The findings of the court in *Merrill* do not attenuate the fiduciary duty owed by Parise's role as an officer of ICCMIC. Most importantly, Parise was specifically identified at ICCMIC's initial board meeting as an officer who was "in a position to influence the policies and corporate governance of [ICCMIC]" within the purview of

section 16(b). *See* Minutes of the March 28, 1999 Meeting of the Board of Directors of ICCMIC. Parise was also one of the only five officers with the title of both senior vice president and managing director. While *Merrill* does indeed state that the title of an officer alone is insufficient to impose a heightened fiduciary duty under section 16(b), Parise's title of officer clearly amounted to more than a mere honorary title.

In summary, the heightened fiduciary duty placed on Parise because of his role as an officer of ICCMIC and ICCAMC, further indicates that he should not be permitted to act as co-counsel against ICCMIC in the Securities Action. Nor should any of the confidential information acquired by Parise in this capacity be accessible to Plaintiff's attorney.

## C. Disqualification Is Appropriate for Stanbury Fishelman

Plaintiff argues that even if Parise had been employed by ICCMIC and an attorney-client relationship had existed between Parise and ICCMIC [20], Parise would still have been able to consult with counsel about his legal rights as a shareholder of ICCMIC. *See* Opposition at 23. Plaintiff supports his position with citations to two California cases that involved in-house counsel who had sued their employers for wrongful termination. In both of those cases, the court found that the attorneys hired by the in-house counsel should not be disqualified.

Plaintiff contends that an attorney suing a former employer/client could disclose confidential information to new counsel in order to seek redress. In *Fox Searchlight Pictures, Inc. v. Paladino,* 89 Cal.App.4th 294, 309, 106 Cal.Rptr.2d 906 (2001), a

**20.** The Court notes that Plaintiff has consistently denied that Parise was employed by

ICCMIC and that an attorney-client relationship existed between Parise and ICCMIC.

former in-house counsel for Fox sued for wrongful termination of employment. Fox sued the former counsel for disclosing confidential and privileged information to the attorneys handling her wrongful termination case. The court denied the corporation's motion to disqualify counsel and held that "in-house counsel may disclose ostensible employer-client confidences to her own attorneys to the extent they may be relevant to the preparation and prosecution of her wrongful termination action against her former client-employer." *Id.* at 310, 106 Cal.Rptr.2d 906. The court also noted its belief that disqualification should not turn on whether the former employee was an attorney for the opposing party or served in some other capacity. *Id.* at 303, 106 Cal.Rptr.2d 906.

*Paladino* is easily distinguishable from the instant matter. As defendants note, *Paladino* is a wrongful termination/breach of contract suit *arising out of the employment relationship* between an attorney and a client.[21] Furthermore, the *Paladino* court specifically relied on California Evidence Code § 958, which states that the attorney-client privilege does not apply to a "communication relevant to an issue of breach, by the lawyer or by the client, of a duty *arising out of the lawyer-client relationship*." *Id.* at 313, 106 Cal.Rptr.2d 906 (emphasis added). In the instant matter, Plaintiff's claims arise under 15 U.S.C. § 77k, not out of ICCMIC's attorney-client relationship with Parise nor out of a breach of contract claims between ICCMIC and Parise.

Thus, none of the cases relied upon by Plaintiff establish that Parise is free to disclose to Stanbury Fishelman, in a purported securities class action, the privileged and confidential information he obtained in the course of his work on ICCMIC's IPO. Furthermore, the need to disqualify Stanbury Fishelman also stems from Parise's fiduciary role as an officer of ICCMIC.

A recent case from this district presents facts similar to those in this case. In *Packard Bell NEC, Inc. v. Aztech Systems Ltd.*, 2001 WL 880957 (C.D.Cal.2001), plaintiff ("PB") moved to disqualify the law firm of Levy Small & Lallas ("Levy") as attorneys for defendant Aztech Systems Ltd. ("Aztech"). Levy had represented Metzler, a former PB officer, in his deposition in the case. As a former office of PB, Metzler had privileged information relevant to PB's prosecution of its action against Aztech. By the time of his deposition, PB had terminated Metzler for divulging attorney-client communications to Aztech. After representing Metzler in his deposition, Levy then became counsel of record in the action to Aztech, the adversary of Metzler's former employer. The Court granted PB's motion to disqualify Levy, finding that Metzler had a "continuing duty to PB to protect privileged and confidential information he learned while at PB . . . it is undisputed that Metzler obtained privileged and confidential information as an officer of PB and that he is obligate to keep the information privileged even though his employment terminated." *Id.* at *8. The court further held that "Metzlers" attorney and agent, the Levy Firm, is obligated to maintain the confidentiality of this same information learned by Metzler while a "PB." *Id.* at *8.

▇▇ Similarly, Parise owes ICCMIC a fiduciary duty by virtue of his position as

---

**21.** The other cases cited by Plaintiff for the same proposition, *General Dynamics Corp. v. Superior Court,* 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487 (1994) and *Santa Clara County Counsel Assn. v. Woodside,* 7 Cal.4th 525, 28 Cal.Rptr.2d 617, 869 P.2d 1142 (1994), are also wrongful termination cases arising out of the employment relationship between an attorney and a client.

an officer, subsequently a Section 16 officer and attorney for ICCMIC. As Parise's agent, Stanbury Fishelman owes ICCMIC the same duty. However, Stanbury Fishelman's duty to ICCMIC conflicts with its duty to Huston and, if a class were certified, to the class, which is to prosecute this securities action against ICCMIC.

A number of factual differences between this case and the factual pattern facing the court in *Packard Bell* make the case for disqualification of Stanbury Fishelman in this action even more compelling. First, Metzler was an officer of PB, while Parise was a Section 16 officer with the title of managing director and senior vice president. Parise also acted as an attorney for ICCMIC. As both an attorney and officer of ICCMIC, Parise's fiduciary duties to ICCMIC were even stronger than Metzler's duties to PB. Second, although Levy represented Metzler at his deposition in the action, Levy did not become counsel for Aztech until after the Metzler deposition, whereas Stanbury Fishelman has been counsel for Huston from the initiation of this action. Finally, *Packard Bell* was not a class action and Levy was not purporting to represent a class, whereas this is a putative class action in which Stanbury Fishelman purport to represent Huston as part of a class of unnamed shareholders. As putative class counsel, Stanbury Fishelman are required to meet a "heightened standard" compared to what it would be required to meet if it were simply seeking to represent an individual party, as Levy was. *See Palumbo*, 157 F.R.D. at 132–33, cited and quoted with approval in *Cal Pak Delivery*, 52 Cal.App.4th at 11–12, 60 Cal. Rptr.2d 207.

## D. Defendants are not Judicially Estopped from Bringing the Motion to Disqualify

Plaintiff argues that Defendants are judicially estopped from claiming that Parise

received confidential communications from ICCMIC in connection with ICCMIC's IPO because Defendants moved to dismiss based on the claim that ICCMIC's IPO disclosures did not omit or misrepresent any material facts. Plaintiff also claims that since the IPO disclosures are obviously public documents, there cannot be anything privileged or confidential about the lawyering underlying those disclosures. They argue that if Parise gave or received material information, then it should have been incorporated into the public disclosure, in which case it would not be privileged or confidential.

 The doctrine of judicial estoppel is invoked to "prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process...The policies underlying preclusion of inconsistent positions are general consideration[s] of the orderly administration of justice and regard for the dignity of the judicial proceedings...Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts." *Jackson v. County of Los Angeles*, 60 Cal. App.4th 171, 181, 70 Cal.Rptr.2d 96 (1997), *citing Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir.1990).

 The Court finds that Defendants have not maintained inconsistent positions in their claims that (1) ICCMIC's IPO disclosures were adequate and did not misrepresent or omit material facts, and (2) Parise was a party to confidential attorney-client communications during the IPO process. There is no requirement that *securities filings such as ICCMIC's IPO disclosures contain all of the* legal advice provided to the drafter of the document. These securities documents may simply

*reflect* such legal advice. Furthermore, the fact that the end product of an attorney's work is public and/or not confidential or privileged, does not deprive the attorney's communications to his client concerning that work of their privilege or confidentiality. All of the advice given to a client as to what provisions to include, or not to include, in a document, and how those provision should be drafted are not stripped of any attorney-client privilege or confidentiality.

In addition, Defendants cannot be judicially estopped as a result of the position for which they argued on their motion to dismiss when the court denied Defendants' motion to dismiss. "A majority of courts apply judicial estoppel only if the court had relied upon the party's previously inconsistent statement, and we have adopted that rule." *Masayesva v. Hale,* 118 F.3d 1371, 1382 (9th Cir.1997); *see also Pegram v. Herdrich,* 530 U.S. 211, 228, 120 S.Ct. 2143, 147 L.Ed.2d 164 fn. 8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on contradictory argument to prevail in another phase."); *Henkel Corp. v. Hartford Acc. & Ind. Co.,* 88 Cal.App.4th 876, 900, 106 Cal. Rptr.2d 341 (2001) ("Judicial estoppel...will be applied when...the party was successful in asserting the first position...")

Finally, the Court does not find that Defendants are playing "fast and loose" with the Court by bringing the instant motion because the Court, concerned with deciding disqualification-related issues in a Motion for Appointment of Lead Plaintiff and Lead Counsel, ordered Defendants to bring the instant motion. Thus, the Court clearly does not consider the instant disqualification issues frivolous.

### E. Stanbury Fishelman's Competence

Defendants also argue that Stanbury Fishelman should be disqualified because the firm is not competent to represent the class in this securities class action. Stanbury Fishelman's incompetence is evident, Defendants argue, from the fact that (1) it gave the wrong time period within which a putative class member could move to be appointed lead plaintiff when it originally gave public notice of this action, (2) it failed to bring a motion for appointment of lead plaintiff within the required time frame, (3) it has failed to be candid with the Court regarding Parise's relationships with Plaintiff and the relevant companies and (4) it has conceded that they have no experience in federal securities class actions.

Plaintiff has not contested Defendants' motion for disqualification on this ground. Therefore, the Court finds that Stanbury Fishelman has demonstrated incompetence in litigating the instant action, as is evidenced by its failure to provide putative class members with the appropriate time period in which they could move to be appointed lead counsel. Without regard to Plaintiff's failure to oppose, the Court also finds that Stanbury Fishelman has not been candid with the Court. Under the unusual circumstances presented, Plaintiff should have been forthcoming with the Court about the co-counsel and financial arrangements between Parise and Stanbury. Finally, the Court finds Stanbury Fishelman's experience and qualifications in securities law to be of a questionable level.

### V. CONCLUSION

For the reasons articulated herein, the Court GRANTS Defendants motion to disqualify. Accordingly, the instant action is STAYED for sixty (60) days to give Plaintiff time to retain new counsel. Plaintiff's

new counsel shall not have contact with Stanbury Fishelman. Parise shall not convey any confidential information to new counsel.

**SO ORDERED.**